UNITED STATES of America, Plaintiff-Appellee,

v.

Walter L. BALLARD, James R. Clark, Ronald B. Pruitt, and John L. Burns, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Raymond F. GRANLUND, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Walter BALLARD, Defendant-Appellant.

Nos. 79–5268, 79–5506 and 80–5752.

United States Court of Appeals, Fifth Circuit.*
Unit B

Dec. 10, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Bruce S. Rogow, Nova University Law Center, Fort Lauderdale, Fla., for Ballard.

Ellis C. McCullough, Houston, Tex., Robert C. Josefsberg, Miami, Fla., for Clark.

Olney G. Wallis, Houston, Tex., for Pruitt and Burns.

G. Ernest Caldwell, Houston, Tex., for Burns.

K. Charles Peterson, Joe H. Reynolds, James R. Leahy, Houston, Tex., Bernard C. Silver, Tampa, Fla., for Granlund.

Judy S. Rice, W. Christian Hoyer, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before MARKEY**, Chief Judge, and HILL and HENDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The five appellants in these consolidated cases have been convicted in jury trials of conspiracy and mail fraud violations in connection with oil transactions that occurred in 1973–74 while the Federal Emergency Petroleum Allocation Act was in effect.

** Honorable Howard T. Markey, Chief Judge for the U.S. Court of Customs and Patent Appeals, Washington, D.C., sitting by designation.

Briefly, we hold that the theory upon which the appellants were successfully prosecuted was incorrect as a matter of law; based upon the evidence presented, we reverse the convictions of four of the appellants and remand the case involving the remaining one.

## I. The Facts

The underlying facts in these cases are rather complex, but they arise from a relatively simple situation: oil pricing laws allowed no seller to make the maximum profit a free market might have provided because a seller could not charge the highest price that a purchaser was willing to pay.

Essentially, each of the appellants worked for enterprises which bought and sold oil. In the transactions here under consideration, the appellants caused these businesses to align themselves in what has been characterized as a "daisy chain." Each sold oil, at its maximum allowable price (and profit) to another which, taking its maximum profit, sold to still another in the chain. The several enterprises each realized its maximum profit before the oil was sold to the ultimate consumer, Florida Power Company. In the complex laws and regulations then controlling the marketing of oil, none prohibited this practice. The prosecution asserts no violation of the Emergency Petroleum Allocation Act ("the Act"). If criminal conduct occurred, it was the commission of mail fraud and conspiracy to do so.

Florida Power Corporation ("FPC"), the buyer at the end of the daisy chain, is a large electric utility company. Though its basic fuel for generating electricity had been number six oil, FPC had begun to use number two oil in late 1972 or early 1973.[1] During 1973, FPC's demand for number two oil increased greatly, and its demand problem was exacerbated by the widespread oil shortage. Under the Act, which dictated that certain amounts of oil be sold on an historical basis, FPC was assured of only ten percent of its number two require-

1. Number two oil and number six oil differ in viscosity.

ments. Unable to fulfill its needs through the supply assured by long-term contracts, FPC was forced to buy oil in the spot market.

Appellant Ray Granlund, apparently the master-mind and executioner of the daisy-chain scheme, was a consultant employed by FPC to assist in its search for oil. Angel P. Perez, who had been President and Chief Executive Officer of FPC until his retirement in 1973, had negotiated the original FPC-Granlund consulting agreement in 1971. The contract had been renewed annually after 1971 and was in effect during the resale scheme.

During 1973 and 1974, Willard Simonds was the fuel manager of FPC and had the primary responsibility for negotiating purchases of all its fuel. Whenever Granlund located a supply of oil, he would call Simonds and tell him the available quantity and price. When Simonds could not obtain needed oil on the spot market at a better price, he would discuss the Granlund offers with Richard Raymond, who was the vice-president of FPC in charge of fuel acquisition and Simond's direct supervisor. Though Simonds often accepted offers relayed by Granlund, he did reject offers on several occasions.

Both prior to and during his employment by FPC, Granlund also worked as a consultant for a subsidiary of Signal Oil and Gas Company ("Signal").[2] Granlund sought buyers of oil for Signal and reported to appellant Walter Ballard, an executive vice-president in charge of marketing. FPC knew when it hired Granlund that he was a consultant with Signal, and Signal knew Granlund was consulting with other companies.

Over the years preceding the Act, including 1973, Signal had purchased oil from Charter International Oil Company ("Charter")—a subsidiary of Charter Oil Company—under a private contract. When the allocation program went into effect in June of 1973, Charter was obligated to sell a certain portion of its oil to Signal based on these historical sales.

Appellant John L. Burns was the Executive Vice-President of Supply and Distribution with Charter and was responsible for, among other things, selling number two oil. Though Charter officials did not know it, Burns also owned stock in Larcon Petroleum Corporation ("Larcon"), an oil marketing company which sometimes bought and sold oil with Charter. Apparently, Burns was not in a policy-setting position with Larcon, but appellant James R. Clark served as Larcon's President during 1973 and 1974. Appellant Granlund also dealt with Larcon and was paid commissions on oil transactions that he brought in. The evidence indicated that Larcon was nearly defunct before it participated in the daisy-chaining.

Appellant Ronald B. Pruitt, a lawyer, assisted Larcon in legal and financial matters. Pruitt also owned part of Matrix Properties ("Matrix"), a corporation originally formed by J. Godfrey and Pruitt in the spring of 1973 to deal in real estate and oil. Burns, Pruitt and Clark were investors in some of the real estate partnerships handled by Matrix, though Burns and Clark were never officers, employees, or shareholders of Matrix itself. Pruitt, who was in charge of Matrix's oil deals, had the profits from all such deals transferred to the Pruitt and Monshaugen ("P & M") trust account, a bank account containing funds held in trust by attorneys Pruitt and Monshaugen. The P & M funds also contained commissions paid by Larcon.

The scheme which involved all of the appellants or their employers was first manifested in April of 1973, when Granlund told Perez and Raymond that he saw an opportunity to make some money in the oil business and that he wanted a letter from FPC authorizing him to accept commissions from oil suppliers that would sell to FPC. Perez told Raymond to compose the letter and to get the necessary approval from the

---

**2.** Signal merged in 1974 with Burmah Oil and Gas but will always be referred to as Signal in this opinion.

FPC legal department. At some point, Granlund told Perez and Raymond that he would share his profits with them. During September 1973 the letter authorizing Granlund to accept commissions from suppliers was prepared by Raymond, transmitted through FPC's legal department and routed to both the general counsel and the president of FPC. The approved letter, sent to Granlund on September 19, 1973, provided as follows:

Pursuant to our consulting agreement with you dated March 2, 1973, and Mr. Perez's and my conversations with you in St. Petersburg on April 23, 1973, it is now recognized that Florida Power Corporation's requirements for petroleum products greatly exceed our previous estimates, and because of the U.S. energy shortage with the resulting tightness of product, more time and work will be required to locate sources of supply to meet our increased requirements.

We recognize that you are under contract to Petroleum Heat and Power, a Signal Oil Company subsidiary, and your first obligation is to them.

It is therefore agreed that after you have fulfilled your obligations to Petrol, you will continue to use your best efforts to locate additional products for Florida Power Corporation. *You will submit all offers of supply with costs to our fuel department for its first refusal and/or acceptance. We further confirm that you may accept compensation from supplying companies without creating a conflict of interest under our consulting agreement with you.* (emphasis added).

Two subsequent letters to Granlund dated February 19, 1974, and March 6, 1975, reiterated the terms of the original commission authorization.

This prosecution centers on oil transactions that occurred after Granlund had received FPC's authorization to receive commissions from suppliers. At trial the government established a series of oil sales involving the business entities that have been discussed. The basic flow of oil (along with the appellants related to the businesses) was established as follows: Charter (Burns) to Signal (Ballard) to Matrix (Pruitt) to Larcon (Clark and Burns) to FPC.[3] Also included in the transactions in this case were sales to Florida Power by Tauber Oil Company ("Tauber"), Mitsui, and Reidy International Oil Company ("Reidy").[4]

Granlund received a commission from his supplier on each of the spot purchases by FPC.[5] Commissions were paid to Granlund individually by Matrix; Larcon, Tauber, and Reidy paid both Granlund and Rotary Oil, a company owned by Granlund. The commissions paid by Larcon and Matrix represented fifty percent of their profits, and commissions to Granlund or Rotary from all these sources totalled $2,331,968.10.

The government has attempted to connect the appellants to the daisy-chaining scheme primarily by virtue of payments which they received from the legitimate profits realized in the oil transactions. The first payment was made on October 30, 1973, when Granlund met with Perez and Raymond at a restaurant, gave each of them an envelope of money,[6] and said, "we have sold some oil and made some money, and this is for you."

During 1974 and 1975, Perez received checks from Granlund totalling $193,255.37; each check was received through the mail. Perez remained on FPC's Board of Directors until March 1977 and did not disclose to them that he had received the mon-

---

3. Of the fifty transactions upon which the indictment is based, Matrix was not involved in forty-four, Charter was not involved in twenty-one, Larcon was not involved in thirteen.

4. The transactions involved eleven sales, one sale, and one sale with these corporations respectively.

5. Signal did not pay Granlund any commissions, but did pay him a consulting fee for finding buyers. Granlund was not involved in oil sales from Charter to Signal and received nothing from Charter.

6. Perez later requested and received payment by check; he gave this cash to Raymond pursuant to Granlund's direction.

ey. Ballard also received checks from Granlund for $193,255.37 from the transactions involved in this case. He was not expressly authorized by Signal to receive compensation from a source other than Signal. All fifty transactions set forth in the indictment resulted in payments to Ballard and Perez and all the payments were made from Rotary Oil funds.

An account in the P & M trust ledgered as the "number two deal" included $270,000 of profit attributable to Matrix's and Larcon's transactions in this case.[7] That income was divided among Burns, Clark, and Pruitt and Monshaugen when an accountant reconciled the P & M trust account for 1973, 1974, and 1975.

Though the dispersal of Matrix and Larcon profits through Granlund to Ballard and Burns would appear to have insured that the flow of oil would be routed through the daisy-chain, there was no direct evidence that Granlund received any favorable treatment from FPC, Perez, Ballard, Signal, Burns, or Charter in return for the money which he paid. Furthermore, it appears that Signal and Charter received the maximum price allowable under federal regulations and that FPC ultimately purchased the oil at a reasonable spot market price despite the intermediate transactions of the daisy-chaining scheme.

## II. The Theory of Fraud Alleged

The appellants were all convicted on six counts of mail fraud under 18 U.S.C. § 1341[8] and one count of conspiracy[9] related to that mail fraud.[10] The indictment charged that the mails were used[11] in a fraudulent scheme in which the appellants combined and conspired to deprive Charter, Signal, and FPC of their employees' honest and faithful services. It set forth several alleged breaches of fiduciary duty—by Granlund, Perez, Raymond, Ballard, and Burns—that were purported to constitute part of the fraudulent scheme.[12]

7. The "number two deal" account had a total gross income of $2,808,999.61 and total expenses of $1,114,744.72.

8. 18 U.S.C. § 1341 (1976) states:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

9. The conspiracy count falls under 18 U.S.C. § 371 (1976), which reads as follows:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or any

purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

10. Five counts of wire fraud under 18 U.S.C. § 1343 were dismissed by the trial court at the conclusion of the government's case.
   Angel P. Perez was originally charged under the same indictment as the appellants. He pled guilty to the conspiracy count and testified for the government in these prosecutions; all other charges against him were dropped.
   Richard Raymond was charged in this indictment but was found not guilty by the jury as to the mail fraud and conspiracy counts.

11. Checks sent in the mail from Granlund to Perez and from FPC to Larcon were described in the seven counts.

12. The indictment charged that it was a part of the conspiracy and the substantive mail fraud that:
   (a) Defendant Granlund locate oil for the use of Florida Power;
   (b) Defendant Granlund arranged [sic] to sell and resell the oil through intermediate companies for the purpose of generating extra profits to enrich the defendants and to

The indictment reflects the theory of fraud upon which the government proceeded in this case. In essence, the government has urged that the mail fraud statute is violated whenever the mail is used to further a scheme in which an employee intentionally breaches a fiduciary duty of honesty or loyalty to an employer by accepting kickbacks.[13] In each of these cases, the trial court's charge to the jury embodied the government's theory.[14]

### III. The Existence of Mail Fraud

Our review of the appellants' convictions has required that we determine the standard for finding mail fraud in a context which the Fifth Circuit has previously had no opportunity to assess. Many other cases have already established the general proposition that fraudulent schemes designed to cause losses of an intangible nature may violate the mail fraud statute. *See, e. g.,*

> defraud Florida Power with the higher oil prices;
> (c) Defendants Perez and Raymond breach their fiduciary duty to Florida Power by, among other things, concealing their knowledge and share of the profits made by Defendant Granlund;
> (d) Defendant Ballard breach his fiduciary duty to Signal by, among other things, concealing his knowledge and share of the profits made by Defendant Granlund;
> (e) Defendant Granlund breach his fiduciary duty to Florida Power and Signal by, among other things, concealing his knowledge and share of profits generated by raising the price of oil he located;
> (f) Defendant Burns breach his fiduciary duty to Charter by, among other things, concealing his knowledge and share of the profits generated by the aforementioned scheme;
> (g) Defendant Clark split profits of Larcon with Defendants Burns, Pruitt and Granlund as payment for their part in the aforementioned scheme;
> (h) Defendant Pruitt split profits of Matrix with Defendants Burns, Clark and Granlund as payment for their part of the aforementioned scheme;
> (i) Defendants Pruitt, Burns and Clark maintain and employee various corporate and partnership entities to conceal and funnel profits and payments made and received by the aforementioned scheme;
> (j) Charter, Signal and Florida Power be deprived of their employees' honest and faithful services.

*United States v. Bohunus,* 628 F.2d 1167 (9th Cir. 1980); *United States v. States,* 488 F.2d 761, 764–66 (8th Cir. 1973), *cert. denied,* 417 U.S. 909, 950, 94 S.Ct. 2605, 3078, 41 L.Ed.2d 212, 671 (1974). Under the facts of this case, though, we find that the government's theory sweeps too broadly and does not correctly reflect the quality and quantity of fraud necessary to invoke the criminal sanctions of § 1341. All fiduciary breaches, it seems, could be found to involve the loss of an intangible—an employee's faithful and honest services. But, as the Seventh Circuit has stated, "[n]ot every breach of fiduciary duty works a criminal fraud." *United States v. George,* 477 F.2d 508, 512 (7th Cir. 1973). We believe that a breach of fiduciary duty can constitute an illegal fraud under § 1341 only when there is some detriment to the employer.[15] The possible detriment here is

13. Other mail fraud prosecutions have involved that theory. *See, e. g. United States v. Mandel,* 591 F.2d 1347 (4th Cir.), *vacated* 602 F.2d 653 (1979) (en banc), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (public official); *United States v. McCracken,* 581 F.2d 719 (8th Cir. 1978); *United States v. Brown,* 540 F.2d 364 (8th Cir. 1976) (public official); *United States v. Bryza,* 522 F.2d 414 (7th Cir. 1975), *cert. denied,* 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Bush,* 522 F.2d 641 (7th Cir. 1975) (public official); *United States v. George,* 477 F.2d 508 (7th Cir. 1973).

14. The pertinent portion of the charge was the same in each case:

> [I]n this instance, if you find beyond a reasonable doubt that the Defendant under consideration acted in the manner described in the indictment and that he breached a fiduciary duty he owed to his employer, or aided and abetted another Defendant in so doing with the result that the employer was deprived of its employee's honest and faithful service; and if you further find that the Defendant under consideration did such acts knowingly and willfully, as those terms are hereafter defined, then you may also find that such a deliberate breach of a fiduciary duty constituted a "scheme to defraud" as that term has been used in these instructions.

15. We feel no need to set forth in detail the historical development of the law under the mail fraud statute from which we have ascertained the scope of its prohibition. Other

that one of the alleged deprivations of an employee's faithful and honest services may have involved a violation of the employee's duty to disclose material information to the employer.[16] *See generally, e. g., United States v. Von Barta*, 635 F.2d 999, 1006 (2d Cir. 1980); *United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). Our focus shall thus be on the duty to disclose, which may be imposed by state or federal statute or may arise from the employment relationship itself, *United States v. Von Barta*, 635 F.2d at 1007, and on materiality, which exists whenever an employee has reason to believe the information would lead a reasonable employer to change its business conduct.[17]

In the case before us, four of the alleged conspirators were charged with breaching fiduciary duties to their employers,[18] and the government has maintained that at least one of the breaches was sufficient to invoke the mail fraud statute. We turn to the allegations against each of the four to determine whether, under the proper standard for mail fraud, a jury could reasonably conclude that the evidence, viewed in the light most favorable to the government, leaves no reasonable doubt as to guilt.

Appellant Ballard, it has been alleged, breached his fiduciary duty to Signal by concealing his knowledge and share of the profits made by Granlund. Even if that is true, however, the breach could not be the basis for a mail fraud. Signal was obtaining the maximum profit that it could make under the Act because it was selling the number two oil in these transactions at the highest allowable price. In the normal, non-regulatory course of business, Signal would have been able to raise its price to capture the profits made on the intermediate transactions. Here, though, that increase in prices would have violated the law. The government has urged that the concealment by Ballard was material nonetheless because Signal might have desired to sell directly to FPC during this period of shortage to gain favor with that customer for the future. The evidence is simply insufficient to support that conjecture.[19] The alleged concealment from Signal was not material even if it occurred.

The indictment similarly charges that Burns breached his fiduciary duty to Charter by concealing his knowledge and share of the profits generated by the scheme. Under the peculiar circumstances present here, the transfer of oil from Charter to Signal in the amounts transferred

---

cases have more fully traced the holdings which lead to our conclusions. *See, e. g., United States v. John von Barta*, 635 F.2d 999, 1005–06 (2d Cir. 1980).

16. The duty to disclose may be violated by either active concealment or affirmative misrepresentation. *See, e. g., id.* at 1006 & n.14.

17. This standard, which is essentially the traditional definition of "materiality," is suggested by the distinction drawn between actual and constructive fraud in *Epstein v. United States*, 174 F.2d 754, 766–68 (6th Cir. 1949), which held that only actual frauds are within the scope of the mail fraud statute. The court described active fraud cases as those in which no attempt could be made to show fairness of dealing since "they [depend] for their success upon concealment and deception and [can] not conceivably be carried out by the guilty parties without covering up the true facts." *Id.* at 767. The court found that the fraud in the case— lack of disclosure of secret profits—was only constructive fraud because it "concluded that the failure to make [a] disclosure did not clothe

... [the] otherwise fair course of dealing with intentional fraud, dishonest in purpose, and inconsistent with moral uprightness." *Id.* at 768. In other words, "[t]here was no reason to believe disclosure by the defendants in *Epstein* would have, under the particular circumstances there, made any bargaining difference to the [employers]." *United States v. George*, 477 F.2d 508, 413, n.5 (1973).

The standard of materiality which we set forth here applies to employers in the private sector; public officials may have a special duty to disclose, based on the public trust, which lowers the threshold of materiality.

18. *See* note 12 *supra.*

19. Signal was apparently receiving what it considered good terms for the oil it sold to participants in the daisy chain. Moreover, other Signal officers—including the president and the comptroller—knew of the insertion of Larcon between Signal and FPC but did nothing to regain direct sales.

and at the price paid would have been unaffected by his disclosure. Charter was required, by the allocation scheme based on historical sales, to sell oil to Signal; moreover, Signal paid Charter the full price allowable under the regulations. Any concealment by Burns did not involve material information; there is no evidence showing that Charter, as a reasonable employer, would have changed its course of dealing if it had known of the scheme.

■ The indictment charges that appellant Granlund breached his fiduciary duty to FPC and Signal "by, among other things, concealing his knowledge and share of profits generated by raising the price of oil he located." Any breach of duty to Signal could not involve material information for the same reasons that Ballard's alleged breach could not. Granlund's duty to FPC, however, must be evaluated under the special instructions that were contained in the letter authorizing his acceptance of commissions. *See United States v. Von Barta*, 635 F.2d at 1007 (evaluating Von Barta's duty of disclosure under the special circumstances there). One such special instruction was, "You will submit all offers of supply with costs to our fuel department for its first refusal and/or acceptance." Given this additional fact, a jury could conclude that Granlund had committed fraud upon FPC by concealing the intermediate transactions in the daisy-chaining scheme. In effect, he would have been fraudulently misrepresenting that FPC was being given a right of first refusal when, in fact, Granlund was seeing to it that others were given the first opportunity to purchase—and resell—the oil.

We have looked to see if the evidence could have made out such deceit and we have found that it could. Granlund had informed Simonds, the fuel acquisition manager for FPC, that purchases had to go through a broker because the refiners would not sell small quantities directly to users. Even if Granlund's statement was true on its face, it may have concealed the extra resellers that had been imposed in the daisy-chain.[20]

The undisclosed information would have been material if, with that information, FPC had been able to purchase the oil at a significantly lower price. A jury might properly make that finding. Consequently, the alleged deprivation of Granlund's faithful and honest services could be within the scope of the mail fraud statute.

Angel P. Perez, by receiving money and concealing Granlund's scheme from FPC, also may have acted in a manner which would constitute a fiduciary duty fraud violation of § 1341.[21] Though the substantive charges against him were dropped, the government, in the appellants' trials, adduced evidence supporting the indictment's charges.

### IV. The Charges of Conspiracy and Aiding and Abetting

Though the actions of Ballard and Burns (as principals) would not have supported a conviction of mail fraud, their activities—as well as those of Pruitt and Clark—could theoretically have been found to have been in support of the fraud by either Granlund or Perez. Therefore, if the indictment's charges were supported by the evidence, the appellants other than Granlund could have been convicted of aiding and abetting a principal as well as conspiring in a scheme to perpetuate a fraud upon FPC.

■ "[I]n order for a person to aid and abet another in the commission of a crime, it is necessary that he associate himself with the unlawful venture; that he participate in it with the desire of accomplishment and that he seek to make it succeed by his actions." *Moore v. United States*, 356 F.2d 39, 43 (5th Cir. 1966). Similarly, one of the

---

20. That Perez knew of the intermediate transactions would not provide a defense to the concealment charge. Perez had been invited into the scheme so his knowledge cannot be attributed to FPC.

21. At the time Perez received money, he was retired and no longer an officer of FPC. He was promised payments, however, while he was still employed there, and he continued to serve on the board of directors while receiving payments.

elements that must be proven to sustain a conspiracy verdict is "the existence of an agreement ... to combine efforts to accomplish an illegal purpose (or to use illegal means to accomplish a legal purpose) ...." *United States v. Crockett*, 534 F.2d 589, 593 (5th Cir. 1976). "The conspirator must knowingly agree to join others to bring about a common goal." *United States v. Middlebrooks*, 618 F.2d 273, 278 (5th Cir. 1980). Because a conspiratorial agreement is often reached in secrecy, the existence of the agreement or common purpose may be inferred from relevant and competent circumstantial evidence, *United States v. Crockett*, 534 F.2d at 594, but the prosecution must still offer some evidence showing that the conspirators knew "the essential of the conspiracy." *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

■ In this case, then, the evidence in support of aiding and abetting and conspiracy must include indications that Ballard, Burns, Pruitt, and Clark knew of the particular fraud which Granlund or Perez could

have committed. More specifically, in order for the other four appellants to have conspired and acted in support of a fraud by Granlund, they must have known of a special obligation on Granlund—which might be found in the letter of September 19, 1973—to provide FPC with a first refusal of oil which he located. In the absence of that obligation, the acceptance of kickbacks and concealment of the scheme here could not be considered to have been in furtherance of a mail fraud,[22] for such conduct, though perhaps subject to criticism, would be consistent with non-fraudulent activities; the appellants could have simply been involved in a non-criminal back-scratching scheme.[23]

■ Our review of the evidence reveals that there was no indication that Ballard, Burns, Pruitt, or Clark knew of any special responsibilities or obligations of Granlund to FPC. Furthermore, there is no evidence showing that they knew of payments to Perez,[24] which might have constituted circumstantial evidence of their involvement in Granlund's scheme to defraud FPC by misrepresenting that it was receiving rights of first refusal. Similarly, because there

**22.** Had Granlund not received the specific instructions, no duty to give FPC a right of first refusal on oil which he located would have arisen. That duty might have arisen from the employment relationship itself if Granlund had been a purchasing agent with the authority to contract for oil, because that specific duty might be deemed to be within a purchasing agent's general duty to give relevant information to FPC. *See generally* W. Seavey, Handbook of the Law of Agency 238 (1964); Restatement (Second) of Agency § 381, Comment a (1957). Granlund, however, was merely employed as a consultant. Like real estate brokers, consultants facilitating oil transactions are paid if they are successful but have no such duty to act unless they have promised to do so, or perhaps if they are employed exclusively. *See* W. Seavey *supra*, at 235.

Once Granlund acted in his consulting capacity, though, he was bound by the rules of loyalty common to all agents, including independent contractors, and all other fiduciaries. *See id.* One such duty is to account for profits: "An agent is under a duty to account to the principal for any financial benefit received by him as the direct result of a transaction conducted by him, whether or not in violation of his duties as agent, unless otherwise agreed." *Id.* at 243; *accord*, Restatement (Second) of Agency § 388.

The letter authorizing Granlund to receive commissions from those selling oil to FPC eliminated this obligation.

Perhaps FPC realized that Granlund, in his capacity as a consultant, would not be restricted by a duty to act, *i. e.*, to reveal offers to sell on a first refusal basis. At any rate, the insertion of that duty into the agreement with Granlund may be found to have protected FPC from his participation in the type of daisy-chaining scheme here, participation which the letter otherwise would appear to have sanctioned.

**23.** We need not consider whether the appellants could be found to have conspired and participated in a scheme to defraud FPC where Granlund's breach involved a violation of the duty to report offers on a first refusal basis but where they believed the breach involved the receipt and concealment of commissions in violation of a duty of loyalty. Under the evidence presented, each of the appellants either knew nothing of his capacity with FPC or had been told of his authorization to receive commissions.

**24.** Under the evidence presented, they would have had no reason to suspect that payments to anyone at FPC were even necessary.

was no evidence that they knew that some of the profits from the intermediate transactions were ultimately being used to pay Perez, they could not have properly been convicted of conspiring with Granlund or aiding and abetting his attempt to deprive FPC of Perez's faithful and honest services.

## V.  Conclusion

Our duty in reviewing appeals is to ascertain whether the law has been stated and applied correctly and to determine whether there is any evidentiary support for findings of fact.  As our previous discussion has shown, the fulfillment of our duty in this case inevitably leads us to reverse the convictions of appellants Ballard, Burns, Pruitt and Clark.  The legal theories upon which the government proceeded do not permit their convictions as principals, and no evidence supports their convictions as conspirators or aiders and abettors.

The jury could have concluded, under a correct theory of law, that Granlund perpetrated a fraud upon FPC through his own concealment or through his payments to Perez, which served to deprive FPC of the faithful and honest services of its employee in a manner that would also have led to concealment of material information.  Nonetheless, we cannot allow his conviction to stand; we must reverse and remand for a new trial.  Since we have rejected a large part of the government's sweeping theory, the charge to the jury was too broad and did not set forth the appropriate standard for establishing guilt under the mail fraud statute.  Moreover, the jury was authorized to find Granlund guilty if the government made out facts supporting any of the criminal theories embodied in the court's charge to them.  Though sufficient evidence of mail fraud and the related conspiracy may

have existed, different jurors could have based guilty verdicts on differing portions of the charge; for example, some may have found his own concealment constituted a fraudulent breach, some may have found he only aided in depriving FPC of the services of Perez, and others may have improperly found he aided Burns in fraudulently breaching his fiduciary duty to Charter.  Because it is impossible to determine whether all of the jurors agreed that Granlund committed one of the acts which could properly support the convictions on mail fraud and conspiracy, he was deprived of a unanimous jury verdict, and we must therefore reverse and remand for a new trial.  *See United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977).

Our disposition of these cases is in no way a condonation of the appellants' behavior.  At a time when a serious national crisis had necessitated the imposition of extraordinary regulations, the appellants sought to circumvent the regulatory pricing mechanism.  The appellants may have acted against the public interest, but they owed no legal duty to uphold a public trust.  Though their transactions accomplished results contrary to the clear intent of the regulations, the daisy-chaining itself was not directly prohibited, and there is no crime in exploiting a lawful opportunity to make a profit.  We refuse to over-extend the mail fraud statute to fill in the gaps in the regulatory scheme passed by Congress.

Judgment in Nos. 79–5268 and 80–5752 REVERSED; judgment in No. 79–5506 REVERSED and REMANDED for further proceedings.[25]

---

**25.**  We need not reach any of the claims raised by appellants Ballard, Burns, Pruitt, and Clark that were not necessary to our decision in this opinion.  Appellant Granlund raises several other issues, however, which we have examined in the interest of judicial economy.  We have determined that the trial court did not err in (1) excluding Granlund's exhibits 54 and 55 at trial, (2) holding that the mail fraud statute

was not preempted by penalties provided in the Emergency Petroleum Allocation Act, and (3) refusing to grant an evidentiary hearing on the question of grand jury bias, prejudice, or interest.  We also dismiss Granlund's motion, which we had carried with this case, either to require the Government to supply record references for stated portions of its brief on appeal or to strike those portions of the brief.