**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas D. O'MALLEY,
Defendant-Appellant.**

No. 79–5083.

United States Court of Appeals,
Eleventh Circuit.

June 23, 1983.

Michael J. Osman, Miami, Fla. (Court-Appointed), Jeffrey A. Tew, Miami, Fla. (Court-Appointed Co-Counsel), Lawrence E. Besser, Miami, Fla., for defendant-appellant.

Atlee W. Wampler, III, U.S. Atty., Jon May, Michael P. Sullivan, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HILL and HATCHETT, Circuit Judges, and HAYNSWORTH*, Senior Circuit Judge.

PER CURIAM:

Thomas E. O'Malley, former Insurance Commissioner of the State of Florida, appeals his convictions on nineteen counts of

---

* Hon. Clement F. Haynsworth, Jr., U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

mail fraud in violation of 18 U.S.C.A. § 1341 and for two counts of extortion in violation of 18 U.S.C.A. § 1951.[1] We affirm.

## FACTS

In 1970, Thomas D. O'Malley, the appellant, was elected Insurance Commissioner of Florida. Following his election, O'Malley entered into a contract with friends and law school associates, Ricardo Ciravolo and Bennett Feldman. By the contract, O'Malley agreed to sell his seventy percent (70%) interest in the law firm of O'Malley and Ciravolo for $240,000. Ciravolo, a minority partner, had a thirty percent (30%) interest in the law firm. In 1969, the year preceding the sale, the law firm had an income of approximately $73,000. Ciravolo and Feldman agreed to buy O'Malley's interest for $240,000 at four percent interest, to be paid over an eight year period.

An addendum to the contract provided that O'Malley would receive no payments in any year in which Ciravolo and Feldman did not each realize an income of $25,000 from the partnership. The addendum further provided that the contract would become void upon the death of any of the parties.

As insurance commissioner, O'Malley regularly met with insurance company executives prior to considering their applications for licenses to do business in Florida. At these meetings, O'Malley occasionally urged insurance companies to use Ciravolo and Feldman's law firm if they needed legal help and often distributed the law firm's business cards. The evidence is best shown by outlining five events.

### A. Hardy Snow

Hardy Snow, president of Accredited Bail Bond Agencies, testified that he met O'Malley in September, 1970, at which time O'Malley indicated that he knew Snow had contributed $4,000 to O'Malley's recently defeated primary rival, and that Snow should contribute $4,000 to the O'Malley campaign if he and Snow were "going to get along." Snow gave O'Malley $4,000 in cash. O'Malley told Snow that in order for the two of them to continue to get along Snow should continue to give money.

In October, 1970, Feldman met Snow at an airport and accepted $1,000 for O'Malley. In September, 1971, O'Malley telephoned Snow, telling him to send the law firm of Ciravolo and Feldman a check for $1,000. When Snow protested, O'Malley urged, alternatively, that Snow could write off the sum as a fee for a building which Snow purchased through the insurance department's receivership, or, that Snow could deduct the sum from his income taxes as attorneys' fees. Snow sent the money to Ciravolo and Feldman, listing it on his income tax return as attorneys' fees. The law firm had not performed legal work for Snow.

---

1. Title 18 U.S.C.A. § 1341, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the di-

rection thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 763; May 24, 1949, c. 139, § 34, 63 Stat. 94.

Title 18 U.S.C.A. § 1951(a) provides that:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Snow testified that O'Malley told him that he intended to force Snow's underwriter, the Southern American Fire Insurance Co. (Southern), out of business. O'Malley told Snow to tell the owner of Southern that he would have to pay O'Malley $10,000 if he wanted everything "to be right" between the two of them. The insurance department eventually forced Southern out of business.

In April, 1972, at O'Malley's suggestion, Snow contributed $400 to O'Malley's trust fund.[2] In January, 1973, Snow made a $300 contribution to the trust fund. O'Malley indicated to Snow that the money in his trust fund would be used for incidental office expenses. The trust fund, however, was used for incidental expenses as well as to pay O'Malley's club memberships and his attorneys' fees.

Snow also testified that he felt compelled to buy two paintings totaling $5,900 from an art show sponsored by O'Malley and his wife. Snow bought the art works after O'Malley telephoned Snow urging him to come to the show, saying, "[i]f you don't come down our friendship can start all over again." Snow's last contribution to O'Malley was $1,000 to O'Malley's legal defense fund. In each instance Snow testified that he gave the money because he felt he had to contribute in order to "get along."

### B. Glyn Sawyer

In 1971, Glyn Sawyer was an officer of the Great Atlantic Insurance Co. (Great Atlantic). At that time, Great Atlantic decided to merge with National Investors Life Insurance Company (National Investors) of Little Rock, Arkansas. In order to do this, Great Atlantic had to obtain the approval of the insurance commissioner.

In June, 1971, Sawyer met O'Malley in New York City while attending a meeting of the national association of insurance commissioners. As Sawyer and O'Malley talked about the merger, O'Malley inquired about Great Atlantic's legal representation. Sawyer told O'Malley that his company was represented by an attorney named Sanchez. O'Malley told Sawyer that Sanchez would not be an effective counsel because Sanchez had not supported O'Malley in his election bid, and therefore, Sanchez could not expect "good service" from the insurance department. When Sawyer asked O'Malley to recommend a law firm, O'Malley recommended Ciravolo and Feldman. Great Atlantic retained Ciravolo and Feldman, and the firm handled the merger. Sawyer testified that he believed that had Great Atlantic used Sanchez the merger would have been delayed.

### C. Jim Hanna

Jim Hanna, a security analyst for the insurance department, denied Commonwealth of Puerto Rico's (Commonwealth) application to do business in Florida. Hanna testified that he denied the application because he believed the company was undercapitalized. Subsequent to the disapproval, O'Malley visited Commonwealth's home office in Puerto Rico. After the visit, Commonwealth retained Feldman as counsel and it was authorized to do business in Florida. Four years later, Commonwealth was declared bankrupt.

Hanna testified that Ciravolo and Feldman began representing Farmers National Life Insurance Co. (Farmers) in the fall of 1973. A year later, Farmers changed owners, which required the company to submit a new application to the insurance department. An insurance department audit revealed that the new owners "were bleeding off" Farmers's assets. The audit also revealed that Farmers had accumulated excessive expenses.

---

2. On direct examination, Hardy Snow described O'Malley's requests for money:

A: I was in Tallahassee on other business, and I stopped in to Mr. O'Malley's office. I spoke with him a few minutes. He called in to his secretary, I assumed—a young lady by the name of Nikki, I believe—and asked if I had ever contributed to his trust fund. And she said no.

And he said "Well" .... He turned to me and says "Give me a check for"—"Write me out a check for $400."

And I in turn wrote him out a check for $400 and gave it to him.

When Hanna learned that O'Malley was engaged in an ongoing contract with Ciravolo and Feldman, he asked the auditors to determine how much money Farmers had paid to the law firm. The figure for 1974 was $57,000. A meeting was held between the employees of the insurance department, a representative from Farmers, and Feldman to determine whether Farmers should be allowed to continue doing business in Florida. Hanna itemized the expenditures thought to be excessive, including the attorneys' fees paid to Ciravolo and Feldman. The insurance department staff thought the legal fees were excessive because it could not determine what work was performed in exchange for the attorneys' fees. In addition, the chief examiner for the insurance department stated that he believed Farmers's assets were worthless. O'Malley disagreed with this assessment, stating that all expenses and fees were justified management decisions. Only after O'Malley left office was Farmers ordered to cease doing business in Florida.

### D. *Thomas Brown*

In September, 1971, Life Insurance Co. of the Southwest (LIC) applied to do business in Florida. LIC's application was not approved until six months later. Thomas Brown, the assistant insurance commissioner, testified that he submitted LIC's application to O'Malley for his signature in May, June, July, August, and September of 1972. O'Malley took no action on the application. Brown testified that Richard Lee, the president of LIC, attempted to call O'Malley in August and November, 1972, concerning the status of the application, but Lee's calls were not returned and his letters were unanswered.

Lee testified that he spoke with Jack Terry, the president of Highlands Insurance Co., about his problem in obtaining approval. As a result of his talk with Terry, Lee contacted and retained the law firm of Ciravolo and Feldman. Brown testified that on March 20, 1973, Feldman sent a letter to the insurance department concerning LIC's application. Ten days later, O'Malley personally approved LIC's application.

### E. *Jack Quaritius*

Jack Quaritius, president of Peninsular Life Insurance Co. (Peninsular), testified that his company decided that it would be advantageous to form a holding company. To form a holding company, Peninsular needed the approval of its stockholders and the insurance department. Quaritius testified that he visited O'Malley in July, 1972, and explained that Peninsular intended to form a holding company and because of upcoming changes in Security and Exchange Commission regulations, the company had to be approved prior to December 31, 1972. Quaritius made several telephone calls to O'Malley, but none of the calls were returned.

Quaritius testified that he learned that O'Malley could be reached through Ciravolo and Feldman. In October, Quaritius contacted Feldman explaining the problem he was having in contacting O'Malley. Later that month, Quaritius played golf with O'Malley and mentioned that his company was considering hiring Ciravolo and Feldman. O'Malley told him that he had no interest in whatever law firm he chose. Quaritius retained Feldman, however, on November 1, 1972, paying $10,000. On November 6, Feldman wrote the insurance department on Peninsular's behalf. Two days later, on November 8, O'Malley approved Peninsular's proposal.

### ISSUES

O'Malley contends that (1) the trial court erred in failing to grant his motion for a judgment of acquittal on the mail fraud counts because the evidence failed to prove that he had a specific intent to defraud; (2) the evidence at trial was insufficient to support his conviction for extortion; (3) the trial court erred in allowing into evidence testimony concerning O'Malley's failure to report campaign contributions and; (4) the trial court improperly denied his motion for severance of Count V of the indictment charging him with extorting a $1,000 check from Hardy Snow for inclusion into O'Mal-

ley's legal defense fund. O'Malley asserts that the trial court's denial of his motion for severance prejudiced his case, as it became necessary to explain to the jury that O'Malley was under pending state impeachment and grand jury proceedings, thereby explaining the need for a legal defense fund.

The government argues, alternatively, that the evidence at trial was sufficient to support O'Malley's conviction for mail fraud. On the fraud counts, the government contends that O'Malley's contractual agreement with Ciravolo and Feldman was to provide a means by which O'Malley steered business to the law firm so that Ciravolo and Feldman would have the funds to make payments to him. The government contends that O'Malley intentionally defrauded the citizens of Florida through this mechanism. By depriving Florida citizens of their right to an honest and faithful government, O'Malley perpetrated a fraud falling within the ambit of 18 U.S.C.A. § 1341. The government also contends that the evidence is sufficient to support O'Malley's conviction for extortion; that no error exists in allowing O'Malley's cross-examination as to his failure to report other contributions; and that a motion for severance is within the discretion of the trial court, not to be reversed except for an abuse of discretion. The government urges that no abuse has occurred in this case.

I. *Mail Fraud Conviction*

O'Malley was charged with defrauding the citizens of Florida of their right to the
> loyal, faithful, disinterested and unbiased services, decisions, actions and performance of official duties ... free from corruption, partiality, willful omission, bias, dishonesty, official misconduct, conflict of interest and fraud.

O'Malley was also charged with defrauding the citizens of Florida of their right to have the state's regulatory business conducted
> honestly, impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments,

and in accordance with the laws of the State of Florida.

O'Malley was charged with defrauding the citizens of Florida
> of certain profits obtained by defendant Thomas D. O'Malley in the performance of his official duties as Insurance Commissioner of the State of Florida.

 Mail fraud, as defined in 18 U.S. C.A. § 1341, is the formation of a scheme or artifice to defraud, together with the use of the mail in the furtherance of that scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The purpose of the mail fraud statute is to prevent the use of the post office to facilitate schemes to defraud. *Parr v. United States,* 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1969).

 The Eleventh Circuit, in adopting the *Pereira* standard for mail fraud, held that mail fraud requires proof of two elements: (1) a scheme to defraud, and (2) use of the mail for the purpose of executing the fraudulent scheme. *United States v. Bosby,* 675 F.2d 1174, 1183 (11th Cir.1982). In *United States v. Hartley,* 678 F.2d 961, 985 (11th Cir.1982), the Eleventh Circuit stated that a conviction for mail fraud also requires proof that a person connected with the scheme "caused" the use of the mails. For purposes of the mail fraud statute, one "causes" the mails to be used when one commits an act with knowledge that the use of the mails will follow in the ordinary course of business, or where one can reasonably foresee such use, even though it may not actually be intended. *United States v. Toney,* 598 F.2d 1349, 1355 (5th Cir.), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1979).

 Intent is essential to the crime of mail fraud because it is a specific intent crime. *See United States v. Freeman,* 619 F.2d 1112, 1117 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). The evidence must show that the defendant had the specific intent to defraud. *United States v. Goss,* 650 F.2d 1336, 1341 (5th Cir.1981). The govern-

ment's case rests on whether it proved beyond a reasonable doubt a scheme on O'Malley's part to defraud the citizens of Florida. *United States v. Zicree,* 605 F.2d 1381, 1384 (5th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). A lapse of fiduciary duty will not in itself be enough to trigger mail fraud, as the lapse of fiduciary duty is not in itself a scheme to defraud. *See United States v. Ballard,* 663 F.2d 534, 540 (5th Cir.1981).

O'Malley argues that at most he is guilty of a mere breach of a fiduciary duty. He contends that he never hid his "business agreement" with Ciravolo and Feldman and thus did not actively misrepresent any fact. O'Malley argues, without citation, that active misrepresentation is required to maintain a mail fraud conviction. We find no case law in this circuit to substantiate a claim that the misrepresentation must be active. Instead, we find that an essential element of mail fraud is that the defendant possess the specific intent to defraud, and that the intent to defraud be evidenced in any way, including non-action, on the part of the defendant. Fraud, for purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation. *See United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981) (where the founder of a church never indicated that increased payments to be paid to its ministers were coming solely from the donations of other members, and where the founder formally represented that the increased payments came from investments made by the church. The concealment of the true source of the funds, along with the representations made, constituted an intentional misrepresentation within the meaning of the mail fraud statute); *Cacy v. United States,* 298 F.2d 227 (9th Cir.1961) (concealment of a material fact is fraud within the scope of the mail fraud statute).

Even if O'Malley's contentions were correct (that an active misrepresentation is required to maintain a conviction for mail fraud), we find that O'Malley, through the creation of a fraudulent contract purportedly for the sale of his law practice, evidenced an intent to defraud the citizens of Florida of his loyal and faithful service.

A reviewing court must view the facts in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The evidence amply supports the conviction as to mail fraud.

O'Malley's contract with Ciravolo and Feldman is more than the sale of an interest in a law firm. The addendum to the contract states that (1) no payment would be due in any year that Ciravolo and Feldman did not earn at least $25,000 each; and (2) the contract would be void upon the death of any of the parties. The contract guarantees Ciravolo and Feldman a certain level of income before the required payment. It is a contract for services, as opposed to a contract for an interest in an item transferable to a decedent's estate. Significantly, Ciravolo and Feldman viewed O'Malley's services as a significant part of the agreement.[3]

---

**3.** Feldman, on direct examination, indicated that O'Malley's services as insurance commissioner, as distinct from his services as an outgoing partner, were a part of the contractual agreement:

Q: What did you consider that you were buying in this Agreement?

A: Well, I was buying an interest in a law firm which the outgoing member was just elected as the State Treasurer and Insurance Commissioner. He had been a County Commissioner for a number of years. He was a Vice Mayor of Dade County. I knew he had substantial contacts with some of the labor movement people, because I knew that some work was being done in the office.

I felt this—I was buying a relationship with a political figure.

Q: Did that include your concept of his political contacts in the future as Insurance Commissioner?

A: Yes.

Ciravolo also felt that the $240,000 paid to O'Malley constituted a payment for special consideration in O'Malley's capacity as insurance commissioner:

Q: Were you paying Mr. O'Malley $240,000 for anything more than just the value of the share of his practice.

Florida Statute § 624.305(2) provides that:

> The insurance commissioner and treasurer or any deputy, examiner, counsel, actuary, assistant or employee of the department, shall not be given nor receive any fee, compensation, loan, gift, or other thing of value in addition to the compensation and expense allowance provided by law, for any service rendered or to be rendered as such commissioner and treasurer, deputy, examiner, counsel, actuary, assistant or employee or in connection therewith.

Section 624.305(2), and other statutes, evidences the desire of the citizens of Florida for an honest and impartial insurance commissioner. Reviewing the facts in the light most favorable to the government, the testimony of O'Malley's former law partners establishes that O'Malley contracted to sell "contacts" to insurance companies.[4] The testimony of Hardy Snow and Jack Quaritius establishes that O'Malley accepted money from insurance company executives and compelled them to contribute in contravention of his statutory duty to forego "compensation" for services rendered in his official capacity as commissioner. A scheme to defraud the citizens of Florida being borne out by the evidence, this court holds that the mail fraud counts were proved by sufficient evidence.[5]

## II. Extortion Convictions

The term extortion, as used in section 1951, means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C.A. § 1951(b)(2). O'Malley contends that the testimony of Sawyer and Snow failed to reveal extortion because of a lack of "force, violence, or fear."

■ O'Malley argues that his extortion convictions must be reversed because the government did not show fear or duress on the part of the individuals testifying at trial. This argument is meritless. Hobbs Act violations based on extortion by a public official need not include proof of threat, fear, or duress. *United States v. Williams,* 621 F.2d 123, 124 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). Section 1951(b)(2) defines extortion as "obtaining of property from another ... induced by wrongful use of actual or threatened force ... or under color of official right." Extortion is either the obtaining of property from another by the wrongful use of actual or threatened force of violence or the obtaining of property from another induced under color of official right. When committed by a public official, no proof of threat, force, or duress is required. *Williams,* 621 F.2d at 124. The coercive nature of the official office provides all the inducement necessary. *Williams,* 621 F.2d at 124. Since no requirement exists that the insurance executives be under duress, or fear of violence from O'Malley, the extortion convictions are

---

A: Well, for the practice. You know, the books, the leases, and everything else. And also that I knew from experience that he—you know, he would be introducing us to someone, and I would, of course, in that frame of reference, would go ahead and, you know—go ahead and attempt to get some additional business if he introduced me to anybody.

. . . .

Q: Would you have agreed to purchase Mr. O'Malley's share of the practice if he had not become Insurance Commissioner?

A: I would have to give it serious thought. I doubt if I would have. For this price, you are asking me?

Q: For $240,000.

A: I doubt I would. I don't think so.

4. The effect of the contract is best shown by the following chart which is constructed from exhibits at the trial.

| Date | Firm | Income | % Derived from Insurance Co. |
|---|---|---|---|
| 1969 | Ciravolo and O'Malley | 73,000 | 0% |
| 1970 | Ciravolo and O'Malley | 88,000 | 0% |
| 1971 | Ciravolo and Feldman | 130,000 | 19% |
| 1972 | Ciravolo and Feldman | 140,000 | 42% |
| 1973 | Ciravolo and Feldman | 201,000 | 48% |
| 1974 | Ciravolo and Feldman | 248,000 | 61% |

5. O'Malley does not make the argument that he did not use the mails. The use of the mails was effected through the mailings in connection with the receiverships handled on behalf of the department by Ciravolo and Feldman, and the applications to do business in Florida.

proved by sufficient evidence. O'Malley conducted his requests for money under the cloak of his official office.

■ Even if duress is required before the extortion convictions can be upheld, it was shown. Snow testified that O'Malley's position as insurance commissioner provided a coercive influence, making him contribute money which he did not wish to contribute.[6] We find that the evidence is sufficient to support O'Malley's convictions for extortion.

### III. *O'Malley's Failure to Report Campaign Contributions*

■ Generally, evidence of the commission of a wholly separate and independent crime from the crime on trial is inadmissible. *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1978). Such extrinsic offense evidence, however, may be presented before a jury if (1) it is determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character, and (2) the evidence possesses probative value which is not substantially outweighed by its undue prejudice. *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

■ On direct examination, O'Malley was asked about his knowledge of laws regarding contributions made to public officials and, specifically, whether he reported all contributions made to his trust fund

pursuant to those laws.[7] Direct examination was limited to whether O'Malley reported these contributions to his trust fund. Normally, cross-examination as to whether O'Malley reported cash contributions not made to the trust fund would be beyond the subject matter of direct examination.

■ Cross-examination is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Fed.R.Evid. 611(b). Federal Rule of Evidence 608(b)(1) gives the trial court the discretion to permit cross-examination of a witness regarding specific instances of conduct concerning that witness's character for truthfulness or untruthfulness. *United States v. Reid,* 634 F.2d 469, 473 (9th Cir. 1980), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981).

■ During direct testimony, O'Malley acknowledged his familiarity with the reporting laws. O'Malley's direct testimony was intended to establish his knowledge of the reporting laws of Florida and his compliance with those laws. Cross-examination, therefore as to O'Malley's failure to report cash contributions was related to the matter of O'Malley's credibility as a witness and was proper impeachment pursuant to rule 611(b).

O'Malley's failure to report contributions, when he knew he was required to do so, directly reflected on his character for truthfulness. Examination as to this conduct was proper.

**6.** On direct testimony, Snow commented:

Q: Why, sir, did you write this check to Ciravolo & Feldman?
A: Well, I—I felt I needed to . . . .
I felt, uh, threatened, if you will. I felt under duress. I felt that I had to send it to get along.

**7.** On direct examination, O'Malley stated:

Q: Now Mr. O'Malley, at the time that you took office in 1971 were you aware of any law in the State of Florida that required a public officer to disclose contributions that he received as an office of the State when the contributions were in excess of $25?
A: Yes, sir.
You are speaking, Mr. Osman, of the trust account?

Q: I am speaking of any law, to your knowledge, existent in the State of Florida in the year 1971 which required you as a public officer to publicly disclose any contribution you received while you were in office, sir, that amounted to more than $25.
A: Yes, sir.
Q: Now, pursuant to that law, Mr. O'Malley, after you took office in 1971 did you, pursuant to that law, form a lawful trust fund?
A: Yes, sir; I did.
Q: And to your knowledge, sir, did you make reports as required by the law as to every single contribution to that trust fund, as well as every single expenditure that was made from that trust fund?
A: Yes, sir; I did.

IV. *Whether the Trial Court Properly De-*
*nied O'Malley's Motion for Severance*

O'Malley argues that the trial court erred in denying his motion to sever Count V of the indictment, because Count V charged O'Malley with extorting a check from Hardy Snow made payable to a law firm handling O'Malley's legal defense. In denying his motion for severance, O'Malley contends that irreparable harm was done to his case because the jury, in learning that O'Malley was under pending state impeachment proceedings, gained knowledge of matters highly prejudicial to the defense of the remaining counts of the indictment.

 In order to obtain a severance under rule 14 of Federal Rules of Criminal Procedure, a defendant must show that prejudice will result from the inclusion of the count in question. The defendant must show that the prejudice can not be alleviated by the trial court and as a result, the defendant will be unable to obtain a fair trial. *United States v. DeSimone,* 660 F.2d 532, 539 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). The granting of a rule 14 motion for severance, however, lies within the sound discretion of the trial court and is reversible only for an abuse of discretion. *United States v. Salomon,* 609 F.2d 1172, 1175 (5th Cir.1980); *cf. United States v. Kopituk,* 690 F.2d 1289, 1355 (11th Cir.1982) (decision of whether relief is appropriate from prejudicial joinder is within the sound discretion of the trial court, reviewable only for an abuse of that discretion.)

 No abuse of discretion exists in this case. The government presented evidence in a way designed not to prejudice O'Malley. O'Malley, has not shown prejudice. The trial court did not abuse its discretion by refusing to grant a severance.

## CONCLUSION

Accordingly, we hold (1) that the evidence was sufficient to support O'Malley's convictions for mail fraud, (2) that the evidence was sufficient to support O'Malley's convictions for extortion, (3) that O'Malley's

cross-examination as to his failure to report campaign contributions was proper impeachment as a matter affecting his credibility as a witness, and (4) that the trial court properly denied O'Malley's motion for severance. We affirm.

AFFIRMED.