**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John H. EVANS, Jr.,**
**Defendant–Appellant.**

**No. 89–8631.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 6, 1990.

---

**33.** *In Re Xonics,* 813 F.2d at 131.

C. Michael Abbott, Atlanta, Ga., for defendant-appellant.

Robert L. Barr, Jr., U.S. Atty., William Gaffney, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and DYER, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

John H. Evans, Jr. appeals his conviction on one count of attempted extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, and one count of subscribing to a materially false federal income tax return for 1986 in violation of 26 U.S.C. § 7206(1). We affirm his convictions on both counts.

## BACKGROUND

In early 1985, Clifford Cormany, Jr. ("Cormany"), a special agent with the Federal Bureau of Investigation ("F.B.I.") was assigned to Atlanta to assist in conducting an undercover investigation, to be known as "Operation Vespine," into allegations of public corruption in the Atlanta area, particularly in the area of rezoning of properties. Using the identity of "Steve Hawkins," Cormany represented himself as a land developer of the company WDH, who had recently moved to the Atlanta area. Cormany told other people that he represented a group of investors that was considering developing various land projects in DeKalb County.

In March of 1985, Albert E. Johnson, who was a subject of the investigation,[1] arranged a meeting between Cormany and John H. Evans, a member of the Board of Commissioners in DeKalb County. During this meeting, Johnson told Evans that Cormany's investment group was looking for assistance with matters related to rezoning and variances.

Subsequently, between August, 1985, and October, 1986, a series of meetings and telephone conversations between Evans and Cormany ensued. Almost all of these meetings and conversations were videotaped or audio taped, and they formed a substantial part of the evidence presented by the government at trial.

During the first of these meetings, in August of 1985, Evans was informed by Johnson and Cormany that Cormany wanted to let his investment group know that it had a "leg up" on other developers in DeKalb County. He aimed to achieve this "leg up" by letting the developers know that WDH was associated with the bodies that governed such things as zoning requests. Evans agreed to help set up meetings for Cormany and Johnson with other commissioners.

Evans was contacted nine months later, in May of 1986, at which time Johnson and Cormany informed him that they wanted to get an area zoned for the highest density possible and that they were willing to do whatever was needed in order to get the zoning passed. There was also discussion of Evans's campaign for reelection which was just getting off the ground. In response to a query from Johnson about what size contribution would be considered meaningful, Evans replied that at a recent fundraising event, contributors were encouraged to give a thousand dollars apiece. Johnson then asked whether Evans needed any "expense money." Evans stated that

---

1. Johnson did not learn of Cormany's true identity until November of 1985, at which point Johnson agreed to assist in the investigation.

he had to order a voter registration list and mailing labels in order to do a precinct mailing. He estimated that it would cost him about $260 and Cormany wrote out a check to Evans for a $300 contribution. Evans used this money to buy the list and sent a thank-you note to Cormany.

In July, 1986, Cormany and Johnson met Evans for lunch and informed him that they had a particular tract of land in mind that they wanted to get rezoned to a higher density. They told Evans that expense monies would be available for Evans if needed. Evans recommended that they meet with members of the DeKalb County Planning Department so they could get their rezoning application filed as soon as possible.

On the morning of July 23, 1986, Evans called Cormany at his undercover apartment. The parties disagree as to whether Evans initiated this call. At trial, Evans testified that he was returning a call that had been placed by Cormany. Cormany testified that the call he received was unsolicited. This call was not recorded. Cormany testified that he did not record the call because he was not expecting a call at his home and had not set up any recording equipment. Cormany further testified that at the end of the conversation, which concerned the filing of the zoning petition, Evans replied that he was "running hard and pulling teeth." Cormany testified that he thought that Evans's references to his campaign were an attempt to discuss money opportunities with him in connection with his rezoning efforts. Later that day, Cormany and Evans spoke again in order to arrange a meeting for the next day. According to Evans, Cormany also told him to bring an indication of his campaign needs. Cormany denied that he asked Evans to prepare any list. This conversation also was not recorded.

Cormany and Evans met on July 24, at which time Cormany informed Evans that there was a "generous budget for anything we do." Evans then produced a document which he referred to as the "draft constitution of the United States," which contained his campaign budget from June 29 to August 12, the date of the primary. The document apparently showed his outstanding campaign debts as well as an estimate of his anticipated campaign expenses throughout the primary. Evans stated that of his $14,180 budget, he had received $6,295, leaving a shortfall of $7,885. At this point the following conversation ensued:

Cormany: Can I, can I talk frankly with you . . .

Evans: Yeah.

. . . . .

Cormany: And, and this is between you and I. I need, I desperately need, your help and your support on this project. You, I'm in one business, you're in another.

Evans: Yeah, yeah you got me.

Cormany: You're, you're the influence you have over there, and the assistance you have over there, I can probably cover that for you.

Evans: Well, let me tell you. I, it's it's cause, see you don't know how I operate. What I'm, what I'm telling you is that, this is what the shortfall is and then you can decide whatever part you want to handle of that.

Cormany: You're talking about seven eight eighty-five.

Evans: Right.

Cormany: That's the balance of what the . . .

Evans: Of what the budget was from June 29th through August 12.

Cormany: But what I'm asking you John, I mean, is if I pick up the entire amount, I mean, does that, would that satis— would that be a reasonable relationship, a reasonable

. . . . .

Evans: Oh, I'll, let me make sure, and I understand both of us are groping . . .

Cormany: Yeah.

Evans: . . . for what we need to say to each other.

. . . . .

Cormany: All I want . . . let me, let me kinda . .

Evans: I'm gonna work. Let me tell you I'm gonna work, if you didn't give me but three, on this, I've promised to help you. I'm gonna work to do that. You understand what I mean.

Cormany: Yeah.

Evans: If you gave me six, I'll do exactly what I said I was gonna do for you. If you gave me one, I'll do exactly what I said I was gonna do for you. I wanna' make sure you're clear on that part. So it doesn't really matter. If I promised to help, that's what I'm gonna do.

Cormany: I understand.

Evans: You see, what I'm doing is giving you is a fair assessment of what my needs are to be re-elected on August 12.

Cormany: Okay.

After some intermediate conversation, the interchange continued as follows:

Cormany: You need cash?

Evans: Yeah ...

Cormany: Check?

Evans: I think we better do it that way.

Cormany: Cash?

Evans: Yeah, I think so in this case.

Cormany: Okay.

Evans: I think so, so there won't be any, any, tinges, or anything.

Cormany: Okay.

Evans: Or, we can do this.

Cormany: You, you, tell me how you prefer it done?

Evans: I mean, let me, let me tell ya'.

Cormany: I can write the check ...

Evans: I know.

Cormany: Or I can give you, I can give you ...

Evans: Okay, I'll tell you now, we don't have to do that. What you do, is make me out one, ahh, for a thousand.

Cormany: Make you out a check for a thousand?

Evans: And, and that means we gonna record it and report it and then the rest would be cash.

Cormany: The rest will be cash?

Evans: Yeah.

Later in the meeting, the conversation continued as follows:

Cormany: But, I hope you understand that, ahh, just because, you're in an election year that's not the only reason that, I mean we would have a budget either way.

Evans: I understand. Oh, I understand that.

Cormany: And you and I would have a budget either way.

Evans: Either way, yep. Oh, I understand that. I understand.

Later that day, Cormany tried to file the application for rezoning of the property, but the application was rejected because the property had been rezoned less than two years before. Evans and Cormany met on July 25, at which time the conversation centered around whether or not this two-year requirement could be waived. At this meeting, Cormany gave Evans $7,000 in cash, which Evans placed in an envelope, and a check for $1,000 payable to the "John Evans Campaign." Evans locked the $7,000 in cash in a drawer in a file cabinet in his campaign office. Evans did not at that time record the $7,000 in cash given to him by Cormany on his books nor on the required state disclosure form. Evans did not report the $7,000 he received from Cormany in his 1986 tax return.

At the August 12 DeKalb County Commission meeting, the waiver was granted by a vote of 4 to 0. On August 27, Cormany filed his application for rezoning. On August 28, Cormany informed Evans that approval of the application would require an amendment to the comprehensive land use plan from low density residential to medium residential.

In early October of 1986, the county's Planning Department recommended denial of Cormany's application to amend the land use plan. On October 28, Cormany decided to end the project by withdrawing the zoning application without prejudice, and the Commission agreed to allow the application to be withdrawn.

On October 7, 1987, F.B.I. Special Agents Clarence Joe Tucker and Gary Morgan interviewed Evans at his office. Evans was

informed that the agents wished to ask him about campaign contributions he had received from developers. Evans told agents that Cormany had given him a campaign contribution of $1,000 and that all of the contributions he received from individuals were reflected on his campaign disclosure reports. Evans failed to mention the additional $7,000 in cash that he had received from Cormany.

Testimony at trial indicated that at the end of his campaign, Evans had a surplus of over $7,000, including the money that he had received from Cormany.[2] He testified that he used $4,100 to repay a campaign debt to his mother, in cash, in November of 1986. He testified that he used the remaining $2,900 to repay himself in December of 1986, for loans that he had made to his own campaign over the years 1982–86. Evans became aware of the undercover investigation in November of 1987. The repayments of loans occurred before Evans became aware of the undercover operation. Evans did not, however, record these payments in his books or amend his state disclosure forms until after he knew that he was under investigation.

## DISCUSSION

### A. Instruction to the Jury on the Law of Extortion under Color of Official Right

■ Evans claims that the district court's instruction to the jury on Count I, extortion "under color of official right," was erroneous in that it did not require the jury to find that Evans *conditioned* his support for Cormany's project on the receipt of some type of payment from Cormany. In other words, Evans claims that the crime of extortion under color of official right requires that a public official initiate some action which induces the victim to part with money or property. Upon review of the charge given to the jury, we find that it correctly sets out Eleventh Circuit law on the elements required for conviction

of the crime of extortion under color of official right.

The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part that "whoever ... affects commerce ... by ... extortion shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

In this case, the judge instructed the jury as follows:

The defendant can be found guilty of [18 U.S.C. § 1951] only if all of the following elements are proved beyond a reasonable doubt: First, that the defendant induced the person described in the indictment to part with property or money; second, that the defendant did so knowingly and willfully by means of extortion as hereinafter defined; third, that the extortionate transaction delayed, interrupted or adversely affected interstate commerce.

Now, extortion in a case involving a public official means the wrongful acquisition of property from someone else under color of official right.

Extortion under color of official right is the wrongful taking by a public official of money or property not due him or his office whether or not the taking was accompanied by force, threat or the use of fear. In other words, the wrongful use of otherwise valid official power may convert dutiful actions into extortion.

So, if a public official *agrees* to take or withhold official action or [sic] the wrongful purpose of inducing a victim to part with property, such action would constitute extortion even though the official was already duty-bound to take or withhold the action in question.

. . . . .

The defendant contends that the $8,000 he received from Agent Cormany was a

---

**2.** Although Evans had spent almost $7,000 more than the $14,000 projected budget for June 30 to August 12 that he showed Cormany, he had also raised approximately $28,000 ($14,000 more than expected), including the cash contributed by Cormany.

campaign contribution. The solicitation of campaign contributions from any person is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to political office. Thus, the acceptance by an elected official of a campaign contribution does not, in itself, constitute a violation of the Hobbs Act even though the donor has business pending before the official.

However, if a public official demands or *accepts* money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution.

(emphasis added).

Evans's first contention is that the court erred in using the words "agrees" and "accepts" italicized above. He points out that the Eleventh Circuit Pattern Jury Instruction states that "if a public official *threatens* to take or withhold official action for the wrongful purpose of inducing a victim to part with property, such a *threat* would constitute extortion...." Evans claims that the distinction between "threaten" and "agree" is a crucial one: the former, he contends, is a "condition precedent" whereas the latter implies "mere acquiescence." Evans argues that the instruction given by the judge was impermissibly "watered down" because a section 1951 violation requires that the payment of money be induced, i.e. that the defendant condition the performance of some official act on payment of money. He states that the overall charge in this case eliminated the requirement of inducement.

We agree with Evans's observation that the charge permitted the jury to convict Evans without finding that he conditioned the performance of an official act upon payment of money. Under the law of this circuit, however, passive acceptance of a benefit by a public official *is* sufficient to form the basis of a Hobbs Act violation if the official knows that he is being offered the payment in exchange for a specific requested exercise of his official power. The official need not take any specific action to induce the offering of the benefit.[3]

Eleventh Circuit law governing the crime of extortion under color of official right was first set out by the former Fifth Circuit in *United States v. Williams,* 621 F.2d 123 (5th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981).[4] In *Williams,* the court stated that:

> The language, "under color of official right," is consonant with the common law definition of extortion, which could be committed only by a public official taking a fee under color of his office, with no proof of threat, force or duress required. The coercive element is supplied by the existence of the public office itself.

*Id.* at 124 (citations omitted).

Evans argues that the Eleventh Circuit decision of *United States v. O'Malley,* 707 F.2d 1240 (11th Cir.1983) stands for the proposition that inducement is still required in a case involving extortion under color of official right. We agree that *O'Malley* speaks in terms of inducement, but note that the decision makes clear that the requirement of inducement is *automatically* satisfied by the power connected with the public office.[5] Therefore, once the defendant has shown that a public official has

---

**3.** This is also the law of the majority of circuits that have addressed the question. *See United States v. Aguon,* 851 F.2d 1158, 1177 (9th Cir. 1988) (en banc) (Wallace, J. dissenting) (collecting cases). It will remain the law of the Eleventh Circuit unless the Supreme Court or the Eleventh Circuit sitting en banc decides otherwise. Only the Second and Ninth Circuits have required an act of inducement by a public official. *See United States v. O'Grady,* 742 F.2d 682, 687–89 (2d Cir.1984) (en banc) and *Aguon,* 851 F.2d 1158.

**4.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**5.** It appears somewhat academic to argue whether inducement is still required if inducement is automatically present by virtue of the official's position. A condition that is always satisfied ceases to be a true condition.

accepted money in return for a requested exercise of official power, no additional inducement need be shown. "The coercive nature of the official office provides all the inducement necessary." *Id.* at 1248; *see also United States v. Glass,* 709 F.2d 669, 674 (11th Cir.1983) (coercive nature of official office takes the place of fear, duress, or threat).

In *United States v. O'Keefe,* this circuit reiterated that "[i]n a Hobbs Act prosecution of a public official, the Government's burden is simple: it must prove that the public official obtained property from another in exchange for performance of his official duties." 825 F.2d 314, 319 (11th Cir.1987); *see also United States v. Sorrow,* 732 F.2d 176, 179 (11th Cir.1984) (compulsion not a necessary element in Hobbs Act prosecution of a public official); *United States v. Swift,* 732 F.2d 878, 880 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985) (same).[6]

Evans, while acknowledging that the Fifth Circuit's decision in *United States v. Dozier,* 672 F.2d 531 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982), is not binding on this court, relies heavily on that decision for the proposition that extortion under color of official right requires that a public official make performance or non-performance of an official act contingent upon the payment of a fee. While this accurately described the conduct at issue in *Dozier,* that court made clear that the Hobbs Act was not limited to such behavior, but that:

> [i]t matters not whether the public official induces payments to perform his duties or not to perform his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951.

672 F.2d at 539 (quoting *United States v. Braasch,* 505 F.2d 139, 151 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975)); *see also United States v. Westmoreland,* 841 F.2d 572, 581 (5th Cir.), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988) (citing *Dozier* and reiterating that a public official may violate the Hobbs Act merely by accepting money in return for a requested exercise of official power); *United States v. Wright,* 797 F.2d 245, 250 (5th Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987) (same). Thus, despite Evans's protestations otherwise, we find the Fifth Circuit's position stemming from its interpretations of the *Williams* decision entirely consistent with that of the Eleventh.

■ As an alternative argument, Evans requests that this panel revisit the Eleventh Circuit position on extortion under color of official right, suggesting that the circuit's holdings do not comport with the legislative history and plain meaning of the statute, and that Eleventh Circuit precedents such as *O'Keefe* and *O'Malley* conflict and cannot be reconciled. We see no inconsistency in Eleventh Circuit precedent on this question and further note that prior decisions of panels of the Eleventh Circuit may only be overruled by the *en banc* court or the Supreme Court. *See United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986).

■ Evans also contends that the instruction was "so confusing, contradictory and ambiguous" that it deprived him of a fair trial. Specifically, he argues that the charge as given did not provide a clear statement regarding the mens rea required by Evans in that it appeared to focus on the actions and intention of the contributor instead of on the actions and intention of the defendant. He states that the charge

---

6. The Seventh Circuit, in a case cited with approval in *Sorrow,* 732 F.2d at 180 and in *Swift,* 732 F.2d at 880, upheld a trial court instruction that "[i]f the public official knows the motivation of the victim focuses on the public official's office and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is

sufficient." *United States v. Hedman,* 630 F.2d 1184, 1194 n. 4 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). The Seventh Circuit found that the instruction was not erroneous, stating that "it is unnecessary to show that the defendant induced the extortionate payment." *Id.* at 1195.

would allow the jury to convict regardless of whether Evans knew that Cormany's motivation for giving him the money was an improper one.

In order to secure a conviction under the Hobbs Act, the government must demonstrate, among other things, that the public official *knew* that the payment he received was motivated by a hope of influence. We agree with Evans that the charge given by the court did not express this requirement as clearly as it might have.[7] The court did state, however, that the public official must agree to take official action "for the *wrongful purpose* of inducing a victim to part with property." (emphasis added). Further, the instruction on Count I informed the jury of the mens rea required by stating that the government must prove beyond a reasonable doubt "that the defendant induced the person ... to part with property ... knowingly and willfully by means of extortion...."[8]

The district court has broad discretion in formulating the charge to the jury, and the court of appeals will not reverse "unless, after examining the entire charge, the Court finds that the issues of law were presented inaccurately, ... or the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989). In this case, we find that, taken as a whole, the charge given by the trial judge properly guided the jury and did not offend due process.

## B. Admission of the Government Chart into Evidence

 Evans claims that the district court erred in admitting a government chart and foundation testimony into evidence that purported to summarize the defendant's finances. The standard regarding determinations of admissibility of evidence is whether there is a clear showing of an abuse of discretion. *United States v. Roper*, 874 F.2d 782, 790 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). For the reasons discussed below, we find that the district court acted well within its discretion in admitting the Robertson chart and the accompanying foundation testimony.

At trial, Thomas Huhn, a private investigator, testified as a summary witness for the defense. Huhn stated that he had examined Evans's ledger books, which comprised Evans's office and campaign record keeping system from 1982 to 1987, in order to determine how much money Evans had personally loaned to his campaign or district office and what repayments were made from the office or campaign back to Evans. On the basis of this examination, Huhn prepared a chart ("the Huhn chart"), which was admitted into evidence. Testifying from this chart, Huhn stated that after Evans had repaid himself $2,900 from the Cormany cash, the campaign and district office still owed Evans approximately $1,235 as of December 31, 1987.[9]

The apparent point of Huhn's testimony and chart was to demonstrate that Evans did not report the $7,000 he received from Cormany on his income tax returns because any money Evans had been repaid for his own loans to his office would not be income and therefore would not have to be reported to the I.R.S.[10]

Prior to Huhn's testimony, Evans had testified that DeKalb County paid each

---

7. In *Hedman*, 630 F.2d at 1184 n. 4, the jury was specifically told that they could only convict "[i]f the public official knows the motivation of the victim focuse[d] on the public official's office." *See also United States v. Nedza*, 880 F.2d 896, 902 n. 13 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 334, 107 L.Ed.2d 323 (1989). Such an instruction more clearly spells out the mens rea required than the instruction given in this case.

8. The court further instructed the jury on the meaning of the words knowingly and willfully.

9. Huhn testified that there were approximately 376 entries for loans from Evans to the campaign and district office and a total of 44 repayments from the campaign and district office to Evans.

10. The court charged the jury that "if you find that the money the defendant received from Cormany was a campaign contribution and that

commissioner, including Evans, $100 per month for incidental expenses such as parking fees, gas, mileage, lunches, etc. The County did not require the commissioners to designate how this expense money was used. Evans testified that he had not reflected these $100 per month payments from DeKalb County in his office ledger. Instead, he deposited the checks for $100 in his personal account, and he claimed the resulting income of $1,200 per year on his tax return each year as business reimbursements for car related expenses.

In its rebuttal case, the government introduced testimony from Ted Malcolm Robertson, a special agent with the I.R.S. Robertson testified that, in his opinion, the $100 per month that Evans had received during the period 1982 to 1987 should have been reflected in his ledgers in order to arrive at an accurate assessment of the amounts owed to or owing from Evans to his campaign and district office. Robertson stated that he had concluded that every item that had been expensed on behalf of Evans was reflected in Evans's ledger books, including expenses for transportation.[11] Robertson testified that he had made a summary chart ("the Robertson chart") which adopted the figures in the Huhn chart, but added in the $100 per month that Evans had received from DeKalb County. On the basis of this chart, Robertson testified that as of December 31, 1987, Evans actually owed his campaign and district office over $4,700.

According to the government, the Robertson chart was introduced to rebut Evans's reasons for not reporting the money to the I.R.S. by showing that Evans could not have believed that he was merely repaying himself a debt. The government sought to show that at the time Evans repaid himself, he was not owed any money from his district and campaign office.

Evans objected to Robertson's testimony and to the Robertson chart on several grounds. He claimed that the chart was irrelevant, erroneous, and argumentative, that it did not meet the requirements of Fed.R.Evid. 1006, and that it resulted in a variance as to Count II of the indictment. The district court overruled Evans's objections to the testimony and the chart as well as Evans's motion for a mistrial based on his variance argument.

Evans claims that the Robertson chart was irrelevant because the $100 per month expense money given to each Commissioner by DeKalb County had nothing to do with Evans's office or campaign records or accounts. He claims that the chart was erroneous because the government was allowed to insert the $100 per month payments into Evans's bookkeeping system for his office without taking into account any of the expenses for which the money was used. Evans argues strenuously that the record demonstrates that he used the $100 per month for car expenses and that he accordingly expensed the $100 per month on I.R.S. form 2106 as an employee business expense. He points out that the evidence showed that he did not claim depreciation, mileage, insurance, gasoline, oil or other expenses on his cars from his campaign and district office account, and that Robertson himself admitted on cross examination that he had not found a single charge in the campaign and district office records for such expenses for any car driven by either Evans or his wife, who served as his campaign manager. Evans claims that as a result of Robertson's testimony, the jury was erroneously led to believe that Evans had repaid himself $6,000 more from his office and campaign loans than was the case.

Finally, Evans claims that the chart was argumentative because the government labeled the DeKalb County money "*re* payments" to Evans to make it correspond to the other repayments Evans received for his loans to his campaign and district office, even though there was evidence that the money was not used in this manner.

---

it was used to pay campaign expenses or debts, the defendant was not required to report it as income on his federal income tax return."

11. Evans had testified that among the items that he included as loans from himself to the campaign were items for car expenses such as gasoline and related matters.

He argues that he had demonstrated that the DeKalb County money was not a repayment but rather an advance for routine expense payments.

We agree with Evans that the testimony by Robertson was contradicted by other evidence at trial. We find, however, that this does not render the admission of the government's evidence irrelevant or erroneous. In an adversarial proceeding, it is not unusual for testimony offered by one side to be contradicted by testimony offered by the opposing side.[12] Here, the jury was presented with the evidence of both sides and was allowed to draw its own conclusions as to whether the $1,200 per year should have been added to the defendant's summary of the repayments made to himself from his campaign and district office. Evans had the opportunity, through cross examination and surrebuttal,[13] to demonstrate that the government's theory was false. The fact that the government tenders unpersuasive evidence does not mean that the admission of evidence was error. Indeed, trial counsel may have been able to turn the tables on the government by showing that the government was putting forth a theory that lacked foundation.

Evans also argues that the chart was not a "summary" within the meaning of Fed.R. Evid. 1006[14] because the DeKalb County payments were not so voluminous that they could not conveniently be examined in court.

Evans is constrained to argue only that the *additional* payments of $1,200 were not a "summary" because, of course, the chart, minus those payments, had already been admitted as a summary chart during presentation of the defense. We find that the district court did not abuse its discretion in admitting the chart as a summary, as it brought together a total of sixty $100 per month payments that Evans received over a five year period.

Finally, Evans argues that the testimony of Agent Robertson set forth an impermissible variance from the charge and the proof. Robertson testified, based on the chart, that when the DeKalb County payments were included, Evans had already taken over $1,100 of undeclared income without regard to what he did with $2,900 from the cash given to him by Cormany. Evans claims that if this evidence were accurate, the jury could believe Evans's testimony as to what he did with the Cormany cash and still convict him.

In *Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960), the Supreme Court stated that the grand jury's charges may not be broadened through amendment except by the grand jury itself. We conclude that *Stirone* has no bearing on the case before us, as it speaks to the situation in which the trial court gives an instruction which expands the jury charge to include additional illegal acts not charged in the indictment. In the instant case, the judge specifically instructed the jury that "the defendant is not on trial for any other specific offense not charged in the indictment."[15]

12. In his briefs before this court, Evans states that "the government knew that its initial premise attempting to justify the infusion of the $6,000 into Evans' campaign and office account was in fact false" and that "the government's efforts can only be characterized as disingenuous sleight-of-hand to irreparably sabotage the defendant's theory of the case." Despite such assertions, we do not understand Evans to be raising the claim that the government knowingly used perjured testimony.

13. After the close of evidence, defense counsel argued that it should be allowed to recall Evans in surrebuttal to challenge testimony on this point. Over the government's objection, the court ruled that it would allow Evans to retake the stand for the limited purpose of explaining how he spent the $1,200 he received each year from DeKalb County to defray his expenses. Counsel then decided not to proceed with any surrebuttal.

14. Fed.R.Evid. 1006 states:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

15. Count II of the indictment charged in relevant part that Evans filed a tax return "he did not believe to be true and correct as to every

In *United States v. Gold*, 743 F.2d 800 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985), we made clear that "properly understood ... a variance exists where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegation." *Id.* at 813 (emphasis in original); *see also United States v. Champion*, 813 F.2d 1154, 1168 (11th Cir. 1987) (government's evidence related to uncharged shipments of marijuana during time of indicted conspiracy did not constitute impermissible variance from the indictment). Here, there was no variance warranting a mistrial and the district court properly denied the motion.

*C. Refusal to give an Entrapment Charge on the Tax Fraud Count*

■■■ Evans claims that the district court erred in refusing to charge the jury on entrapment with respect to Count II of the indictment, which charged Evans with subscribing to a false tax return for 1986.[16]

A defendant is entitled to have presented instructions relating to a theory of defense "for which there is *any foundation* in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir.1986) (quoting *United States v. Young*, 464 F.2d 160, 164 (5th Cir.1972) (emphasis added)). In order to raise the issue of entrapment, a defendant must come forward with some evidence that "the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *United States v. Parr*, 716 F.2d 796, 802–03 (11th Cir.1983) (citations omitted); *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986). Therefore, in reviewing a district court's failure to instruct

the jury on a theory of entrapment, we look to see whether the court correctly concluded that the defendant failed to present more than a scintilla of evidence in support of an entrapment defense.

Evans first contends that the evidence that was sufficient to authorize the entrapment charge on the extortion count (Count I) would also authorize it on the count of failure to report $7,000 as income (Count II). Evans's argument appears to be that when he was entrapped into extorting the money, he was simultaneously entrapped into not recording $7,000 of it as a campaign contribution. He goes on to argue that once he decided not to record that money as a campaign contribution, he was "logically" foreclosed from disclosing it to the I.R.S. We find this argument, though creative, to be without merit. First, while there may be evidence sufficient to support a charge of entrapment on the general offense of extortion, there is no evidence that the government played any role in Evans's decision, after receiving the $8,000, to record only $1,000 as a campaign contribution. Even if such evidence existed, Evans's subsequent decision not to declare the additional $7,000 on his income tax form was wholly separate from his decision not to record it in his campaign ledgers. Thus, we find that the giving of an entrapment charge on Count I in no way required the court to give an entrapment charge on Count II.

Evans also argues that his entrapment defense is supported by the transcript of his July 24, 1986, meeting with Cormany at which Cormany requested that the payment not be disclosed. Evans contends that when he responded that he would not disclose the $7,000, he "clearly signaled his future intention with regard to disclosure to the I.R.S."

We need not reach the question of whether a mere request by a government agent not to disclose money to the I.R.S.

material matter in that ... the Evans's adjusted gross income in 1986 was at least $35,739.67 *as a result of a $7,000 cash payment he received from Clifford Cormany a/k/a Steve Hawkins.*" (emphasis added).

**16.** An entrapment charge was given on Count I.

would provide a sufficient basis for an entrapment charge, for our review of the transcript and the videotape convinces us that Cormany made no such request.[17] Although Cormany requested that Evans not inform anyone of the transaction, at no point did Cormany suggest or request that Evans not report the money to the I.R.S. in his tax return. Thus, there is no basis to conclude that Cormany's request for confidentiality "created a substantial risk that the offense would be committed by a person other than one ready to commit it." *Parr*, 716 F.2d at 802–03. We hold that the district court correctly ruled that Evans's showing of entrapment was insufficient as a matter of law to send the issue to the jury and that it did not err in refusing to give an entrapment charge with respect to Count II.

### D. Exclusion of Testimony by Dr. Robert Shuy

 Evans's final claims concern two evidentiary rulings by the district court limiting the evidence that the defense was allowed to put before the jury.

First, Evans argues that the district court abused its discretion in refusing to permit the defense expert on linguistics, Dr. Roger W. Shuy, to assist the jury in examining in court the eighteen tapes admitted into evidence. Dr. Shuy was presented as an expert in the field of conversation or discourse analysis. The defense offered Dr. Shuy to testify about the structure of conversation including such concepts as "topic isolation," "response analysis," "feedback markers," and the "contamination principle." [18] The defense also sought to introduce, pursuant to Fed. R.Evid. 1006, five charts showing Dr. Shuy's conclusions about certain "themes" that recurred throughout the conversations. The court ruled that Dr. Shuy would not be permitted to testify.

Evans claims that the testimony would have helped the jury determine whether it was more or less probable that Evans understood the illegal nature of the plan through reference to specific taped conversations. As far as the summary was concerned, Evans argues that the only way to review multiple and lengthy tape sequences is by means of a chart or summary. He notes that the expert was able to listen to the tapes repeatedly, whereas the jury heard the tapes only once at trial. He argues that the summary charts, which dealt with broader themes over a period of time, could only be assembled after an extensive review that no jury would have the ability to undertake.[19]

**17.** The transcript of the conversation, in relevant part, was as follows:

> Cormany: Okay. Now this, listen, when I say this is between you and I ...
> Evans: Okay.
> Cormany: ... John, let me tell you something, I mean ...
> Evans: Won't say a word
> Cormany: I don't mean Al [Johnson], I mean, I prefer to have it that way. Not that I don't trust Al.
> Evans: Period. No, no, no.
> Cormany: And, and ...
> Evans: Period.
> Cormany: Bob [Howard] don't need to know.
> Evans: Nobody.
> Cormany: Okay?
> Evans: You can count on it.
>
> . . . . .
>
> Cormany: I just saw, ah, Al show up, so this ...
> Evans: Oh.
> Cormany: ... This is between you and I.
> Evans: No problem.
>
> Cormany: Then, I mean. My accountant will find out I made a thousand dollar contribution from my check book.
> Evans: Yeah, fine, fine.
> Cormany: We got so much, so many different accounts and everything, I mean, you know ...
> Evans: (Laughs)
> Cormany: He won't, he won't even miss the rest of it.

**18.** At the trial court's evidentiary hearing on the proffer of this evidence, Dr. Shuy testified that "topic analysis" refers to identification of the major themes of the speakers in the conversation which indicate the agenda of the speakers, that "feedback markers" are responses such as "Uh huh" which may or may not mean "I agree with what the speaker is saying," and that the "contamination principle" is the process by which a listener becomes contaminated in the eyes of a third party listener/observer by the actions of the speaker.

**19.** As an example, he notes that a summary would have demonstrated that Cormany or Al

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.[20] Under this rule, prior to admitting expert testimony, "the trial judge must determine that the expert testimony will be relevant and will be helpful to the trier of fact." *United States v. Piccinonna*, 885 F.2d 1529, 1531 (11th Cir.1989) (en banc) (footnotes omitted). We have stressed that, in deciding whether to admit testimony, "a trial judge must be sensitive to the jury's temptation to allow the judgment of another authority to substitute for its own." *United States v. Sorondo*, 845 F.2d 945, 949 (11th Cir.1988).

In this case, the district court held an extensive evidentiary hearing regarding the defendant's proffer of Dr. Shuy's testimony. In deciding not to admit the testimony, the court concluded that while a jury in an appropriate case might be aided by testimony from a linguistic expert, the case at bar was not appropriate for such testimony. The court based this conclusion on several grounds. First, it noted that the recordings and transcripts that formed the basis of Dr. Shuy's conclusions were in evidence, had been played and read in court, and could be played and read again by the jury during deliberations. The court also found that the expert's testimony would not assist the jury because the subject matter of the testimony, conversation, was one which could be expected to be within the general knowledge of jurors. Finally, the court found that the testimony could be confusing and misleading to the jurors because it took matters out of context and, in some instances, was in the nature of conclusions regarding the appropriate interpretations to make of the recorded conversations.

We hold that the district court acted within its discretion in excluding Dr. Shuy's testimony. In considering whether the expert would aid the jury's ability to understand the taped conversations and whether

the danger of jury confusion outweighed the testimony's probative value, the court engaged in the correct inquiry. *Cf. United States v. Schmidt*, 711 F.2d 595, 598 (5th Cir.1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984) (refusal to admit expert testimony of linguistics expert not an abuse of discretion where court concluded that testimony would not assist jury); *United States v. Devine*, 787 F.2d 1086, 1088 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 107 (1986) (not error to refuse to admit linguist's testimony where contents of tape recorded conversation not outside the average person's understanding); *United States v. DeLuna*, 763 F.2d 897, 912 (8th Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (no error to refuse proffered expert testimony on discourse analysis). Further, our review of the evidentiary hearing on the admissibility of the expert testimony convinces us that the district court's findings on these matters were well supported. In this case, questions regarding the defendant's understanding of the illegality of the operation and the extent of government inducement were at the center of the trial. The jury's task was to determine, on the basis of its collective experience and judgment, what Evans's state of mind was when he accepted the money and whether he was entrapped into committing the crime for which he was charged. We agree with the district court that expert testimony would not have aided the jury in performing this task and that the testimony presented a risk that the jury would allow the judgment of the expert to substitute for its own.

In refusing to admit the expert's charts as a summary pursuant to Fed.R.Evid. 1006, the court found that certain of the headings of the charts impermissibly reflected the expert's opinion as to the content of the recorded testimony that had previously been presented to the jury. We

Johnson offered Evans money at thirty different times over the course of the investigation.

20. Fed.R.Evid. 702 states:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

hold that the district court did not abuse its discretion in refusing to admit the proffered charts on this basis, as a summary of the tapes would necessarily entail judgments about the content of the conversations.

### E. Refusal to Allow Cross–Examination of Agent Cormany on the Attorney General's Guidelines on F.B.I. Undercover Operations

Evans also claims that the district court abused its discretion in prohibiting cross-examination of Agent Cormany on the Attorney General's internal guidelines on F.B.I. undercover operations. Evans argues that such an examination would have aided the jury in deciding whether he was entrapped, as it would have shown the degree to which the F.B.I. strayed from the regulations that should have governed its conduct. He argues that the guidelines provide standards to assist the jury in evaluating whether or not the government adhered to minimum standards of fairness.

Evans admits that this is not a case where an agency is required to adhere to its own regulations under penalty of having its actions nullified. *Cf. United States v. Pacheco–Ortiz*, 889 F.2d 301, 307–11 (1st Cir.1989) (discussing judicial sanctions for Department of Justice's failure to follow internal guidelines regarding warnings to targets called before the grand jury). He argues, however, that the government should not be permitted to conceal from the jury the F.B.I.'s violation of its own rules in an effort to snare a citizen.

We conclude that these guidelines were not of sufficient relevance to the jury's determination on the question of entrapment to warrant their admission. The defense of entrapment concerns only the defendant's lack of predisposition to commit the crime. "Where a defendant is predisposed to commit a crime, he cannot be entrapped, regardless of how outrageous or overreaching the government's conduct may be." *United States v. Rey*, 811 F.2d 1453, 1455 (11th Cir.), *cert. denied*, 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987) (*citing Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976)). Given the guidelines' lack of probative value on the issue of entrapment, we hold that the district court's decision to disallow cross-examination was not an abuse of discretion.

### CONCLUSION

For the foregoing reasons, the defendant's convictions on both counts of the indictment are AFFIRMED.