**UNITED STATES of America, Plaintiff**

v.

**Mohammed Zaki AMAWI,
et al., Defendants.**

**Case No. 3:06CR719.**

United States District Court,
N.D. Ohio,
Western Division.

May 2, 2008.

Amy B. Cleary, Dennis G. Terez, Jonathan P. Witmer–Rich, Timothy C. Ivey, Edward G. Bryan, Office of the Federal Public Defender, Cleveland, OH, Bradley F. Hubbell, John Czarnecki, Cooper & Walinski, Toledo, OH, William W. Swor, Detroit, MI, Elias Muawad, Muawad & Muawad, Bloomfield Hills, MI, for Defendant Mohammed Zaki Amawi.

Charles M. Boss, Boss & Vitou, Maumee, OH, Stephen D. Hartman, Kerger & Associates, Toledo, OH, Alek H. El–Kamhawy, Raslan, El–Kamhawy & Pla, Cleveland, OH, for Defendant Marwan Othman El–Hindi.

David L. Doughten, Cleveland, OH, Jeffrey J. Helmick, Helmick & Hoolahan, Toledo, OH, Mohammed Abdrabboh, Wyandotte, MI, for Defendant Wassim I. Mazloum.

David I. Miller, Jerome J. Teresinski, U.S. Department of Justice—Counter Terrorism Section, Washington, DC, Gregg N. Sofer, Office of the U.S. Attorney, Austin, TX, Thomas E. Getz, Justin E. Herdman, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

## ORDER

JAMES G. CARR, Chief Judge.

This is a criminal case in which two defendants have submitted reports by experts whom they desire to call as defense witnesses. The government has moved orally to exclude the proposed testimony of three of the four proposed defense experts.

For the reasons that follow, those witnesses will not be permitted to testify.

### Background

Count 1 of the superceding indictment charges that the three defendants, Mohammed Zaki Amawi, Marwan El–Hindi and Wassim Mazloum, conspired to kill and maim American service personnel in Iraq. Count 2 charges the defendants conspired to provide material support and resources to persons seeking to kill U.S. Nationals outside the United States.[1] The indictment also alleges that Amawi and El–Hindi unlawfully distributed a "how to" video and manual relating to bomb making.

An informant employed by the F.B.I., Darren Griffin, gathered much of the government's evidence, which consists, to a considerable extent, of conversations Griffin recorded surreptitiously. He also video-recorded some of those conversations. Other evidence introduced thus far in the trial, which has included Griffin's testimony, has encompassed, in part, copies of videotapes Amawi obtained from the internet and viewed with Griffin. Some of the conversations recorded by Griffin included conversations between him and Amawi as they were watching some of the videos.

Many of those videos depict attacks on military personnel by roadside bombs; others show other acts of violence against various targets and persons. Some of the videos bear the logo of Al–Quaeda in Iraq. The internet source from which Amawi obtained many, if not most, of his videos is unknowable.

The government does not allege that any organized terrorist or insurgent organization solicited the defendants to commit the crimes charged to them. Nonetheless, it submitted several reports by its proposed expert, Evan Kohlmann. The subjects as to which the government wanted Kohlmann to testify included

origin, nature, and utility of the actual computer evidence obtained from the defendants. Of equal importance, Mr. Kohlmann's testimony will provide important explanation for jurors, who are unlikely to have any knowledge of the phenomenon of terrorist groups' use of the internet. The actual expert opinions which the government expects Mr. Kohlmann to render are limited to the following areas: (i) the use of the internet by numerous terrorist organizations as a vehicle for recruitment and training of terrorist supporters, sympathizers, and prospective jihadists; (ii) the process by which Mr. Kohlmann himself has methodically collected and maintained a database of documents, communiqués, and multimedia files distributed by these groups; (iii) an analysis of the quantity and quality of the internet materials assembled by the defendants in this case, as well as an opinion of the relative difficulty required to obtain such a collection; (iv) specific explanation as to discrete items discussed by the defendants in consensually-recorded conversations.

[Doc. 701 at 3–4].

I granted the defendants' motion to preclude Kohlmann's testimony because, in summary, I concluded that expert testimony was not: 1) necessary about the nature of the videos viewed by the jury, as the jurors could readily tell what they were and depicted; 2) permissible as to the original sources of the videos [i.e., who produced them and where they first were posted] because there was insufficient reason to believe that Amawi obtained his copies from the original-source website, rather than other sources; 3) appropriate

---

**1.** The statute, 18 U.S.C. § 2332, under which Count 2 is brought is commonly referred to as "providing material support to terrorists" [or terrorism].

as to the purposes for which the videos, according to Kohlmann, were produced or could be used by those who viewed them; 4) the only means by which the jurors could or should become informed, to the extent they need to be informed, about various groups, persons, events and terms; and 5) accurate, with regard to the difficulties, as expressed in his initial written reports, as to the difficulty of accessing the videos collected by Amawi. [Doc. 701].[2]

Among other considerations underlying my decision to exclude Kohlmann's testimony, as proposed by the government in light of his lengthy and detailed reports and testimony at a pretrial hearing, was the grave risk of undue and unfair prejudice to the defendants. Much of his testimony related either directly or indirectly to overseas terrorist and insurgent organizations active in the Middle East and elsewhere. The defendants had no connection with any of those groups; to allow testimony about them would invariably suggest to the jury that somehow they did.

This case involves, in part, the government's claim that the defendants conspired to kill or maim U.S. Nationals [i.e., American service personnel] in Iraq, and that they conspired to provide material support or resources to others seeking to kill American service personnel in that country. "Terrorism" generically, or as practiced specifically by various groups with which the defendants have no connection is not, however, a proper subject for evidence in this case. This is particularly true with regard to groups not alleged to be active in Iraq.

In my view, it is of crucial importance that the evidence in this case relate to what the indictment charges, criminal code prohibits and penalizes, and defendants did and wanted to do, rather than what others, with whom the defendants had no affiliation, have done, continue to do and want to do. This is so, even though, according to the government, the defendants held views similar to, and perhaps in accordance with, those other groups and persons, and viewed their objectives and goals favorably.

With this perception, and through this lens and its deliberately narrow field of focus, I consider the defendants' proposed expert testimony and the government's objections to that testimony.

### 1. Reza Aslan

Reza Aslan is a doctoral student at the University of California at Santa Barbara. He expects to complete his dissertation on *Jihadism as a Social Movement* later this year. He is a 1995 Phi Beta Kappa graduate of Santa Clara University, having majored in religious studies and minored in English and Greek. He has masters degrees in Theological Studies from Harvard Divinity School and Fine Arts in Fiction from the Iowa Writers' Workshop. He presently is an Assistant Professor at the University of California at Riverside, teaching courses in religion and creative writing.

Random House published Mr. Aslan's No God but God—The Origins, Evolution, and Future of Islam in 2005. In September, it will also publish his How to Win a

---

**2.** Since that decision, the parties have undertaken to formulate definitions of various places, groups, persons, events and terms to be provided to the jury. That work is not yet complete and may not ultimately be successful. In anticipation, in part, that the definitions on those subjects may not otherwise be presented to the jury and in response, it ap-

pears, to the defendants' expert reports, the government has asked me to allow Kohlmann to testify on a reduced span of topics. I granted that request orally in limited part at a hearing on April 29, 2008. I also noted that if agreed definitions are not to be given to the jury, Dr. Kohlmann may be permitted to testify as to some of the terms.

Cosmic War: Why We're Losing the War on Terror. He also anticipates that W.W. Norton will publish Words Without Borders: An Anthology of Contemporary Literature From the Muslim World sometime this year. He has provided seven "marketplace commentaries" on and nineteen "essays and commentaries" on current events in the Middle East and Islam.

Amawi proposes to have Mr. Aslan testify about:

- the origins and early development of Islam and emergence of the concept of jihad;
- the concept of jihad and its variations;
- the Salafist movement and its current iteration;
- the rise of the contemporary jihadist social movement and political ideology;
- how jihadism has become a global social movement, similar to other contemporary social movements; and
- how contemporary global social movements function [i.e.: their means of rallying similarly aggrieved persons to their cause, forming a "collective identity" and engaging in similar pursuits; how many adherents of their tenets are "free riders," rather than active participants in the movement; the need for intensive one-on-communication to transform a "free rider" into an active participant; and how such one-on-one contact has preceded the commitment and involvement of persons in terrorism or insurgency].

The predicate for admissibility of expert testimony under Fed.R.Evid. 702 is that "specialized knowledge will assist the trier of fact to understand the evidence or to determinate a fact in issue." The government argues that none of Mr. Aslan's proposed testimony relates to any facts in issue.

The defendant argues, in response, that the jurors have little, if any understanding about the history and nature of Islam, the role of jihad in that faith, the meaning of "jihad," how jihadist movements have arisen, or the purpose, nature, actions and goals of such movements. To the extent individual jurors may have some understanding about those subjects, that understanding is, the defendant suggests, more likely than not inaccurate.

In view of the defendants' strong religious beliefs and the role that religious views appear—at least from many of the recorded conversations already heard by the jury—to have played in the defendants' lives, Amawi contends that Aslan's testimony is crucial to a fair trial. If not permitted to gain a more full and accurate understanding of Islam, the jurors, the defendant asserts, cannot evaluate the defendant's statements and actions in a proper context.

The same is true, the defendant argues, with regard to the term and concept of jihad and the formation and actions of jihadist movements. Likening such movements to other "global social movements," such as radical environmentalist or anti-globalization movements, the defendant states that the jury necessarily will have a distorted view, draw false inferences and, possibly, come to an erroneous decision about what he was saying and doing as reflected in the government's evidence.

According to his counsel, for example, interlacing of religious and political commentary in many of the recorded conversations is simply a variant of how adherents of Islam in the Middle East and elsewhere express their religious and political consciousness. While they may do so in terms and ways that, to Western eyes, are peculiar or radical, Mr. Aslan, the defen-

dant indicates, will explain that persons of such persuasion and views rarely act them out. And, before doing so, persons who do take action in furtherance of those views have been influenced by direct, one-on-one contact with militant proponents of violent action and objectives.

■ I agree with the government that, as thus projected, the proffered testimony does not relate to facts in issue. Just as this case is not about "Terrorism" writ large, it is not about Islam or jihadist movements generally. Indeed, if this testimony were admitted, the door would be opened to admitting far more of Kohlmann's proposed testimony than I continue to consider appropriate about the origin, nature, functioning, actions and goals of various specific jihadist groups.

Moreover, even if, as Aslan will relate, various "global social movements" function, in general, in particular ways and may share certain common modes, the nexus between such ways and modes and these defendants is either non-existent or simply too speculative to permit his testimony.

Even if, as well, the proffered testimony would give some insight into Amawi's mind set and thus what he meant by his religious/political statements, its probative value as to his intent is substantially outweighed by its tendency to confuse the issues in this case.

As noted, this is not a case about Islam, jihadist movements or Terrorism. This is a case about whether specific acts violated federal criminal laws. To dwell, even briefly, on the history of Islam and rise of "global social organizations" would, however, suggest to the jury that those subjects have, or might have, some place in their deliberations. If nothing else, this would conflict sharply with the extensive efforts during voir dire to make certain that neither the jurors' nor the defendants' reli-gious views would affect the jury's deliberations.

The government's motion to exclude Mr. Aslan's testimony shall be granted.

### 2. Jon B. Alterman

Since November, 2002, Jon B. Alterman has been a Senior Fellow and Director of the Center for Strategic and International Studies in Washington, D.C. The Center is a "think tank" and Mr. Alterman focuses on the Center's Middle East research agenda. He graduated with honors in Public and International Affairs from Princeton University, has a master's degree in history from Columbia University and a masters and doctoral degree in history from Harvard University. Before his current employment, he worked at other think tanks for two years and the State Department for a year.

Mr. Alterman has either edited, co-authored or written five books: UNDERSTANDING ISLAMIC CHARITIES (co-editor, 2007); ARAB REFORM AND FOREIGN AID: LESSONS FROM MOROCCO (co-author, 2006); EGYPT AND AMERICAN FOREIGN ASSISTANCE, 1952–1956: HOPES DASHED (2002); NEW MEDIA, NEW POLITICS?: FROM SATELLITE TELEVISION TO THE INTERNET IN THE ARAB WORLD (1998); SADAT AND HIS LEGACY: EGYPT AND THE WORLD (1998). He has also authored about eight scholarly articles, book chapters and newspaper and magazine articles. He has lectured extensively on United States foreign policy, Arab media, and the Middle East.

Amawi proposes to have Mr. Alterman testify about:

- the geography of and geo-political dynamics in the Middle East;
- Middle Eastern cultural norms likely to be unfamiliar to Americans;
- conversational conventions in spoken Arabic;

- Middle Eastern attitudes towards the United States and effect of its policies in the region;
- Middle Eastern public opinion as of 2004 toward the American invasion of Iraq and the insurgency in that country;
- doubts among many in the Middle East that Muslims committed the 9/11 attacks in the United States;
- Muslim–Arab views towards Osama bin Laden;
- the limited involvement of Jordanians in the Iraqi insurgency;
- the rise, status and programming of "new media" in the Middle East;
- the function of jihadist videos in the Arab world; and
- how and why youth in the Middle East seek out and view jihadist videos.

The defendant argues that he will be "demystified" by this testimony, which will set his outlook, views and attitudes in a cultural context. This testimony, the defendant states, will show how his views, as heard by the jury in the recordings, are commonplace and widely shared. It is also important, he contends, that the jury learn that only a very small percentage of the participants in the Iraqi insurgency are foreign-born. An understanding of the rise of the Arab "new" media, from which he obtained his downloaded videos, and its widespread effect on younger persons in the Arab world will, he indicates, similarly explain those activities on his part.

██ My response to this proposed testimony is similar to my reaction to Kohlmann's and Aslan's proposed testimony: namely, that it involves matters ancillary to the issues in the case, and to what the jury must decide. Middle Eastern cultural norms, attitudes toward the United States—especially after the 2003 invasion of Iraq—views about 9/11 and Osama bin Laden, and the new media and its impact on younger persons in the Arab world can, at most, possibly give some insight into Amawi's mind set.

But even that possibility is speculative. Whether his views and their origins may conform to those held by others like him elsewhere does not matter. This case is about what he and codefendants did, and whether what they did violated American law.

With regard to the proposed testimony about the very small number of Jordanians who are involved in the insurgency, that testimony appears to contain a logical fallacy. The fact that only one in how many thousands or hundreds of thousands of Jordanians has gone to Iraq says nothing about whether Amawi himself would have gone, or wanted to go, as the government alleges, to Iraq.

As importantly, and as with Aslan's testimony, this testimony would confuse the issues. This is not a case about the rise and role of new media in the Arab world. To be sure, the internet was the source of the videos in evidence; but it is hardly likely that the jurors need the assistance of an expert to understand how Amawi came to possess those videos. Those videos are, in any event, what they are, and no elaboration is needed to understand that fact.

This is likewise not a case about Arab attitudes or geo-political dynamics in the Middle East. Whatever probative value there might be to evidence about those attitudes and their origins, such value would be substantially outweighed by the risk of confusion of the issues for the jury.

Finally, while Mr. Alterman could inform the jury about conversational conventions in spoken Arabic, there is little, if any, need for such evidence. The significance, or lack thereof, of such terms as

"insallah" and "brother" is readily perceptible as one listens to the recordings.

The government's oral motion to preclude the testimony of Jon B. Alterman shall be granted.

### 3. Roger W. Shuy

■ Roger W. Shuy, Ph.D., is Emeritus Professor of Linguistics at Georgetown University. He founded and then for thirty years directed Georgetown's sociolinguistic program. According to his Preliminary Report, Prof. Shuy is familiar with and able to apply "standard and accepted analytical procedures to discover and analyze language structure and principles."

With regard to this case, Prof. Shuy engaged in "discourse analysis," based on a review of the conversations that Griffin recorded. This analysis encompassed: 1) topic analysis; 2) response analysis; and 3) "conversation strategy analysis."

The first two of these analyses—topics and responses—as presented in Prof. Shuy's report, constitute little, if any, more than a recitation of what is readily discernible in the recorded conversations.

As to topics, Prof. Shuy notes the topics El–Hindi raises and their recurrent incidence, the physical setting in which he raises them, and the frequent disconnect between what El–Hindi and Griffin want to talk about.

Prof. Shuy's response analysis likewise consists, in essence, of a recapitulation of readily ascertainable aspects of how El–Hindi and Griffin interacted, or failed to interact, during their various encounters and conversations.

Thus, the first two segments of the proposed testimony provide nothing beyond that which the jury can hear for themselves, or from which counsel can urge them to draw the inferences they seek to have the jurors draw.

■ The same is true with regard to the remaining segment of Prof. Shuy's proposed testimony—"conversation strategy analysis." According to Prof. Shuy's report, "[s]peakers use language strategies consciously or unconsciously in their conversations with others." The principal such strategy emphasized in Prof. Shuy's report is ambiguity, particularly with the term "training." But, as Prof. Shuy observes, the recorded conversations provide a basis on which El–Hindi's counsel can argue that his "various referential meanings of 'training' remain constant even though Mr. Griffin tries very hard to convert them to his own meaning."

The jury will be as able, especially when guided by the arguments of counsel, to reach the same conclusions [to the extent supported by the evidence] about Griffin's "conversational strategies" as contained in Prof. Shuy's proposed report, despite its semi-academic dressage. The jurors will not need the aid of his testimony to perceive and understand the significance of the evidence and arguments of counsel.

Based on his understanding of Griffin's deployment of these strategies, Prof. Shuy's report offers several conclusions about the ways in which Griffin's mode of conversing with El–Hindi impaired commonality of understanding, especially with regard to the term "training."

According to him, an undercover agent—presumably, he means, an experienced and competent undercover agent seeking and generally able to obtain clear expressions of illegal intent on the part of his or her target—will: 1) let the targets speak freely; 2) failing that to elicit useful evidence, offer hints of illegality to evoke an incriminating response; and 3) if still not successful, speak directly and unambiguously.

As Prof. Shuy points out, Griffin did not follow this pattern. He was, as he himself admits, "proactive," often dominating the conversation and "talking over" other

speakers. Aside from his admissions, the recordings speak for themselves with regard to the accuracy, or lack thereof, of this self-assessment of how he sought to accomplish his "information gathering" goals.

Each of the points made in Prof. Shuy's conclusions can be made readily by El–Hindi's counsel: namely, that Griffin did not let El–Hindi talk freely, which is how one participant in a conversation typically finds out what another has on his or her mind, means, and wants to communicate. Counsel can point out that Griffin never once asked, "What do you want to do" or "What would you like me to do," much less, "What sort of 'training' are you talking about?"

Counsel can point out the extent to which Griffin, rather than El–Hindi, raised and, in effect, sponsored certain topics, and sought to direct the conversations in ways other than they might, perhaps, have taken but for how he went about his work. They can, as well, point out where and how, in their view, El–Hindi was inattentive, distracted, preoccupied, unresponsive and/or uncomprehending. Counsel can argue that Griffin diminished the likelihood of comprehension, and thus conspiratorial agreement, by the strategies that he was employing.

The fact that Griffin's use of those strategies was unconscious, rather than deliberate or directed by the F.B.I., does not matter. The effect on El–Hindi's understanding of what Griffin was talking about was the same regardless of whether Griffin was merely inarticulate and unaware of how he was employing certain strategies, or knew exactly what he was doing in that regard. To the extent the recordings support Prof. Shuy's observations and conclusions, they show what, whether conscious or not, was going on, and further expert commentary is not necessary.

I conclude, accordingly, that El–Hindi's counsel, to make their points, and the jury, to understand the evidence and those points, do not need Dr. Shuy's assistance.

Other courts have found testimony of the sort proffered here, including testimony by Prof. Shuy, not to be admissible for similar reasons. Thus, in *U.S. v. Evans*, 910 F.2d 790, 803 (11th Cir.1990), the court, confirming the trial court's disallowance of Prof. Shuy's testimony, stated:

In deciding not to admit the testimony, the court concluded that while a jury in an appropriate case might be aided by testimony from a linguistic expert, the case at bar was not appropriate for such testimony. The court based this conclusion on several grounds. First, it noted that the recordings and transcripts that formed the basis of Dr. Shuy's conclusions were in evidence, had been played and read in court, and could be played and read again by the jury during deliberations. The court also found that the expert's testimony would not assist the jury because the subject matter of the testimony, conversation, was one which could be expected to be within the general knowledge of jurors. Finally, the court found that the testimony could be confusing and misleading to the jurors because it took matters out of context and, in some instances, was in the nature of conclusions regarding the appropriate interpretations to make of the recorded conversations.

We hold that the district court acted within its discretion in excluding Dr. Shuy's testimony. In considering whether the expert would aid the jury's ability to understand the taped conversations and whether the danger of jury confusion outweighed the testimony's probative value, the court engaged in the correct inquiry. *Cf. United States v. Schmidt*, 711 F.2d 595, 598 (5th Cir. 1983), *cert. denied*, 464 U.S. 1041, 104

S.Ct. 705, 79 L.Ed.2d 169 (1984) (refusal to admit expert testimony of linguistics expert not an abuse of discretion where court concluded that testimony would not assist jury); *United States v. Devine,* 787 F.2d 1086, 1088 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 107 (1986) (not error to refuse to admit linguist's testimony where contents of tape recorded conversation not outside the average person's understanding); *United States v. DeLuna,* 763 F.2d 897, 912 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (no error to refuse proffered expert testimony on discourse analysis). Further, our review of the evidentiary hearing on the admissibility of the expert testimony convinces us that the district court's findings on these matters were well supported. In this case, questions regarding the defendant's understanding of the illegality of the operation and the extent of government inducement were at the center of the trial. The jury's task was to determine, on the basis of its collective experience and judgment, what Evans's state of mind was when he accepted the money and whether he was entrapped into committing the crime for which he was charged. We agree with the district court that expert testimony would not have aided the jury in performing this task and that the testimony presented a risk that the jury would allow the judgment of the expert to substitute for its own.[3]

Involving conspiracy charges, this case has at its core the issue of intent: whether the defendants intended to agree with one another to commit the alleged illegal activities. It resembles *U.S. v. Kupau,* 781 F.2d 740, 745 (9th Cir.1986), another case in which the defense sought to have Prof. Shuy testify. Upholding the trial court's exclusion of Prof. Shuy's proposed testimony, the court stated:

> Shuy would have testified as to Kupau's intent based on the expert's analysis of an ordinary, brief conversation from aspects such as linguistics, discourse analysis, conversational analysis, structural analysis, topic recycling, topic clustering, response analysis, referencing analysis, language function analysis, and contrastive analysis. Such testimony was aimed not at explaining technical terms used in the conversation.... Instead, this expert sought to interpret language in ordinary usage, which the district court found would have confused, not assisted, the jury.

*Id.* (citations omitted).[4]

For the reasons expressed herein, as amplified in *Evans, Kupau,* and the other

---

**3.** In *Evans* the district court's refusal to permit Prof. Shuy's testimony also encompassed charts supportive of that testimony. As I stated at the hearing on the government's oral motion to exclude, El–Hindi's counsel will be entitled to prepare and display charts reflecting their Shuy-derived points, if they wish, during closing argument. In other words, if they want to have demonstrative aids at hand [but not admitted into evidence] showing the frequency with which certain circumstances arose, they may do so.

**4.** Other criminal cases upholding exclusion or limitation of testimony by Prof. Shuy include *U.S. v. Mitchell,* 49 F.3d 769, 780–781 (D.C.Cir.1995) (proposed testimony "not only involves matters of general knowledge, but is squarely within the traditional province of the jury."); *U.S. v. Edelman,* 873 F.2d 791, 795 (5th Cir.1989) (testimony concerned "matters within the common knowledge of the jury"); *U.S. v. Shields,* 1992 WL 43239, at *33–34 (N.D.Ill.) (disallowing testimony regarding discourse analysis); *State v. Hill,* 601 So.2d 684, 693–94 (La.App.1992) (testimony would not have aided jury; properly excluded under state equivalent of Fed.R.Evid. 403); *State v. Conway,* 193 N.J.Super. 133, 169–71, 472 A.2d 588, 608–09 (1984) (upholding finding that "discourse analysis" testimony was no scientifically reliable means of determining speaker's intent during covertly recorded conversations and that such testimony would

cases disallowing Prof. Shuy's proposed testimony, I agree with the government that Prof. Shuy's proposed testimony should not be admitted.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT the government's oral motion to exclude the proposed testimony of Reza Aslan, Jon B. Alterman, and Roger W. Shuy be, and the same hereby is granted.

So ordered.

have been confusing to the jury); *Rogers v. State,* 1999 WL 93274, at *8–10 (Tex.App.)

(exclusion based on state law equivalent to Fed.R.Evid. 403) (unreported disposition).